FILED

2023 NOV 20  PM 3: 58

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____ *CR*

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

**JOHN DAVIS and JESSE HERFEL,**

    **Plaintiffs,**

**v.**            **Case No. 1:23-cv-1017**

**KELLER WILLIAMS REALTY, INC,**
**GARY KELLER, JOHN KELLER,**
**JOSH TEAM, BUSINESS MAPS, LTD.,**
**BUSINESS MAPS MANAGEMENT, LLC,**
**72SOLD, INC., JONATHAN DUPREE,**
**MARC KING, JASON ABRAMS, MATT**
**GREEN, WILLIAM SOTEROFF, KWx,**
**LIVIAN, and KW SOUTHWEST REGION,**

    **Defendants.**

---

**PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiffs John Davis ("**Davis**") and Jesse Herfel ("**Herfel**") (hereinafter collectively referred to as "**Plaintiffs**") complain of Defendants Keller Williams Realty, Inc. ("**KWRI**" or "**Keller Williams**"), Gary Keller, John Keller, Josh Team ("**Team**"), Business MAPS, Ltd., Business MAPS Management, LLC (together, "**MAPS**"), 72Sold, Inc. ("**72Sold**"), Jonathan Dupree ("**Dupree**"), Marc King ("**King**"), Jason Abrams ("**Abrams**"), Matt Green ("**Green**"), William Soteroff ("**Soteroff**"), KWx, LLC ("**KWx**"), Livian LLC ("**Livian**"), and KW Southwest Region, LLC (the "**Southwest Region**") (hereinafter collectively referred to as "**Defendants**") as follows:

<u>**THE NATURE OF THE ACTION**</u>

1.  Gary Keller owns Keller Williams, MAPS, 72Sold, Livian, KWx, and a slew of related or affiliated privately owned entities that are entangled in and eating from Keller Williams'

web. According to Keller, "**because we're private, we're not under a microscope. We can do what we want, any way we want with no penalty.**" (Gary Keller email to Plaintiff John Davis dated October 10, 2018).

2.      This action arises out of the fraudulent, illegal business scheme of Keller Williams, the world's largest real estate franchise by agent count, with more than 1,100 offices and 191,000 agents[1], and its web of affiliated entities and individuals who control, operate, and directly benefit from the KWRI business model and franchise system.

3.      Through this illegal and criminal-minded scheme, the Defendants sought to and indeed did fraudulently induce individuals, including Plaintiffs, to invest substantial amounts of money and time and purchase Keller Williams Regions and Market Centers through false and changing representations according to their playbook, and thereafter, exploited their control and economic power in order to extract exorbitant payments from the owners of these independently owned and operated Regions and Market Centers. As a result, Defendants derive grossly inflated sales and profits, creating an illusion of corporate growth and business prosperity while causing substantial, permanent, irreparable financial harm to the owners of independently owned and operated Regions and Market Centers.

4.      Defendants' scheme consists of three primary components. First, Defendants engage in a pattern of fraudulently inducing individuals, including unsuspecting investors and first-time business owners, to purchase KWRI Regions and Market Centers by knowingly, willfully, and intentionally misrepresenting the true nature of the contractual relationship, the financial

---

[1] Keller Williams is also number one in units and sales volume in the United States. See Keller Williams Dominates RealTrends 500, Keller Williams (Mar. 24, 2023), available at https://headquarters.kw.com/press/keller-williams-dominates-realtrends-500/#:~:text=Austin%2C%20Texas%2Dbased%20Keller%20Williams,volume%20in%20the%20United%20States.

prospects and likelihood of success and long-term stability for the independently owned and operated Regions and Market Centers.

5.     Defendants further take advantage of the owners of independently owned and operated Market Centers by demanding that Market Centers lower their agent cap, going directly against their own franchise agreements which state that Market Center owners set their own cap at the time the licensing agreement is signed, thereby instantaneously and completely devaluing the independently owned and operated Market Centers, and taking hostile action against and effectively ostracize or affix a scarlet letter on any Market Center owners who refuse to comply with Defendants' scheme. Indeed, Gary Keller, the godfather of the syndicate, has stated that he would "financially destroy," and threatened to remove from leadership, those that did not comply.

6.     Second, Defendants exploit the overwhelming economic power that their syndicate holds over Region and Market Center owners by creating a captive artificial consumer market, comprised of all of its Market Centers, for products and services that KWRI requires to begin and continue the operation of a KWRI Market Center.

7.     While concealing the full nature of its own relationships with "suppliers" of these services from potential owners, KWRI uses its exclusive control over the Market Center system to, among other things, funnel hundreds of millions of dollars to Keller, individually or through Keller owned and controlled companies other than KWRI, by forcing Market Center owners to: (a) purchase unneeded goods and services from KWRI owned and/or affiliated companies, which are owned by Keller; (b) purchase and/or over purchase unnecessary, obligatory "coaching" from MAPS, which is also conveniently owned and operated by Keller; (c) employ coaches to train Market Center employees/independent contractors using MAPS techniques, or suffer backlash or even potential non-renewal of Market Center agreements if they failed to comply or pay the

required fees; (d) buy books written by or for Gary Keller for his own personal enrichment and self-serving needs; (e) pay an ever-increasing "technology fee" that would make Microsoft envious, for unoriginal and buggy software, and, on information and belief, an improper allocation of funds for purposes outside of the defined and accepted terms of the franchising agreements; and (f) participate in the Keller-owned program 72Sold, as Gary Keller focused multiple Regional Director meetings on increasing participation in the program, thereby increasing his own bottom line, instead of helping franchisees who were suffering through a profit crisis.

8.     <u>Third</u>, once the franchises are devalued and/or after Defendants successfully cause a franchise owner to be unjustly ostracized from the investor group, and the owner has no choice but to sell the entity or face financial hardship and/or bankruptcy, Defendants improperly interfere with the sale of independently owned and operated Regions and Market Centers, refuse to allow sales at market price to qualified individuals, and instead dictate that sales be made at extremely depreciated prices to Gary Keller himself and/or others within the KWRI enterprise. Indeed, Defendants' playbook, as stated by Gary Keller himself, is "why buy what we can steal."

9.     Defendants' conduct inherently raises a conflict of interest that routinely results in KWRI and the individual defendants choosing their own interests over those of its own franchisees within the KWRI franchise system. Further, Gary Keller and KWRI consistently engage in conduct wherein they seek to target, punish, and destroy those that attempt to go against Gary Keller. Defendants' pyramid scheme-type playbook pits franchisees against each other in a divide and conquer manner, where only Gary Keller comes out on top or wins.

10.    The fraudulent intent underlying Defendants' scheme includes, among other things: (a) deceptively inducing individuals to purchase, build up, and continuing to throw money into their so-called independently owned and operated Regions and Market Centers, (b) extracting

exorbitant fees from the franchisees, thereby devaluing the franchise of profit while funneling money to Keller-owned entities, and (c) demanding that franchises or investor interests therein be sold back to KWRI-affiliated individuals at a below-market price.

11.     The scheme is demonstrated by a pattern of behavior when the inevitable financial losses of both Regions and Market Center owners come to pass. Through this scheme, KWRI itself and the other Defendants suffer no loss, and only gains, from the harm caused to the individual owners. In total, Defendants' scheme has caused franchisees to lose hundreds of millions of dollars in total. Unless stopped, Defendants will continue to subject franchisees to the same scheme for the purposes of substantial interest and profit.

12.     Worse, on information and belief, Gary Keller has misappropriated, diverted, and embezzled the millions of dollars in fees collected from franchisees for purposes outside the scope of franchise agreements, and to fund his own personal ventures, through his new holding company, KWx. Instead of being used to better the KWRI franchise system, as advertised in the franchise agreements, on information and belief, these fees are being used to enrich Gary and John Keller, all while the franchisees are left drowning.

13.     Over the years, KWRI has called itself many different things: first, KWRI called itself a "Profit Share company." Then, KWRI called itself a "training and coaching company masquerading as a real estate company." Later, KWRI declared itself a "technology company." No matter what KWRI attempts to label itself, at the end of the day, KWRI is a franchise company, and KWRI's scheme runs afoul of franchise ethics and puts the franchisees, who are main components funding these different aspects of KWRI, at a disadvantage from the start.

14.     As a franchise company, KWRI has achieved growth, wealth and fame, which has led to Gary Keller's personal financial freedom. Indeed, due to KWRI's Royalties and technology

fees, Gary Keller's income has more than doubled. All the franchisees have gotten, however, are lies, deception, and severe depreciation in value of their investment, with Owner Profit down nearly 50% since Gary Keller, and subsequently his son John Keller, took over control of KWRI after Davis's departure as CEO.

15.     Despite Keller's assertions, and due to Defendants' illegal conduct, Plaintiffs bring this action alleging violations of the Racketeer Influenced and Corrupt Organization ("**RICO**") Act, 18 U.S.C. § 1962, violation of § 1 of the Sherman Act, and embezzlement.

## **THE PARTIES**

16.     John Davis is a natural person and a resident of Colorado.

17.     Jesse Herfel is a natural person and a resident of Arizona.

18.     Keller Williams Realty, Inc. is a Texas for-profit corporation with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Valerie Volger-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

19.     Gary Keller is a natural person residing in Travis County, Texas, and may be served with process at his residence located at 105 Riley Drive, Austin, Texas 78746, or wherever he may be found.

20.     John Keller is a natural person residing in Travis County, Texas, and may be served with process at his residence located at 105 Riley Drive, Austin, Texas 78746, or wherever he may be found.

21.     Josh Team is a natural person residing in Tarrant County, Texas, and may be served at 3309 Alexandria Ct., Southlake, Texas 76092, or wherever he may be found.

22.     Business MAPS, Ltd. is a Texas limited partnership with its principal place of

6

business located in Travis County, Texas, and may be served through its registered agent, Valerie Volger-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

23.     Business MAPS Management, LLC, which is the General Partner of Business MAPS, Ltd., is a Texas limited liability company with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Valerie Volger-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

24.     72Sold, Inc. is an Arizona for-profit corporation with its principal place of business located in Scottsdale, Arizona, and may be served through its registered agent, Corporation Service Company, at 8825 N 23rd Avenue Suite 100, Phoenix, Arizona 85021.

25.     Jonathan Dupree is a natural person residing in Henderson, Nevada and may be served at his residence or wherever he may be found.

26.     Marc King is a natural person residing in Austin, Texas and may be served at his residence or wherever he may be found.

27.     Jason Abrams is a natural person residing in Austin, Texas and may be served at his residence or wherever he may be found.

28.     Matt Green is a natural person residing in Park City, Utah and may be served at his residence or wherever he may be found.

29.     William Soteroff is a natural person residing in Austin, Texas and may be served at his residence or wherever he may be found.

30.     KWx, LLC is a Texas limited liability company with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Valerie Vogler-Stipe, at 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she

may be found.

31.     Livian LLC is a Texas limited liability company with its principal place of business located in Williamson County, Texas, and may be served through its registered agent, Luan Nguyen, at 4652 Arques Ave., Round Rock, Texas 78681, or wherever she may be found.

32.     The KW Southwest Region, LLC is a Texas limited liability company with its principal place of business located in Travis County, Texas, and may be served through its registered agent, Marc King, at 200 Bright Sky Drive, Austin, Texas 78737, or wherever he may be found.

## JURISDICTION AND VENUE

33.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332 because (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

34.     This Court has personal jurisdiction over Defendants because they reside or are incorporated in, and/or conduct business in, the State of Texas.

35.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

## I.     KWRI BACKGROUND AND STRUCTURE

36.     KWRI was founded by Defendant Gary Keller and co-founder Joe Williams in 1983 as a single real estate office located in Austin, Texas.

37.     Throughout the 1980s and 1990s, Keller Williams was a small regional residential

real estate company based in Austin, Texas, that began franchising local market centers. It moved along in fits and starts but could not develop consistent patterns and practices for growth.

38.     Originally, KWRI operated as a traditional split model for its agents (for example: 50/50 or 60/40).

39.     Eventually, however, KWRI, in an effort to compete with and recruit real estate agents from other real estate companies, moved to a "cap" system, wherein the fees paid by agents are capped annually, and once the set cap is met, the agent receives 100% of the commission earned per transaction.

40.     Under the cap system, the Market Center collects a portion of the commission until the agent caps, which goes towards the agent's Market Center cap, and contributes to the independently owned and operated Market Center's individual profit as well as the robustness of the office, including products, support and services provided by the Market Center for the success of the agents.

41.     The amount of the cap for any particular Market Center depends largely on the conditions of the market in which it is located. For example, setting a single cap for different markets would severely harm the profitability of Market Centers located in higher cost markets, and this has been seen to be true.

42.     Indeed, a franchisor attempting to set a universal cap by looking at national market conditions is akin to determining a local city's temperature by looking at the nation's average temperature. Therefore, a Market Center cap is highly individualized to each particular Market Center and, until 2019, was set by the individual Market Center when the licensing agreement was signed. The Market Center cap then could only be changed by the Market Center owner in response to factors in their local business environment.

43.     In addition to the Market Center cap, the Market Center also collects a universal Royalty fee per transaction, which is wired from the Market Center directly to KWRI as part of a monthly transmittal. Royalty is collected per transaction and is capped at $3,000.

44.     This cap system enabled KWRI to recruit top earning agents throughout the country and led to the success of KWRI as one of the fastest growing real estate companies nationwide.

45.     As KWRI expanded, it quickly shifted from one single office to a thriving franchise system, comprised of KWRI and KWRI Regions and Market Centers, which are independently owned and operated.

46.     Keller Williams is the head of the franchise system, which was founded, owned, and controlled by Defendant Gary Keller. Gary Keller also serves as the Chairman of the Board, has served as CEO, and is currently the de-facto CEO.[2] As a franchisor, Gary Keller is bound by franchise law and ethics, which he routinely circumvents in an effort to increase his own control and bottom line.[3]

47.     There are still a few independent Regions that Gary Keller has not bought back yet; however, Gary Keller, members of his Board, and his associates own and control the majority of the approximately 32 Regions, making the Keller Williams Regions an extension of Defendant Gary Keller's personal empire, rather than a functioning franchise system.

48.     This control of the Regions allows Gary Keller to leave the franchisor's boundaries behind with the net effect being he is like an employer to the independently owned and

---

[2] John Keller has recently stepped into the role of CEO at KWRI. On information and belief, this was done in an attempt to mitigate Gary Keller's liability after Davis's initial complaint in this matter was filed.

[3] Franchisees purchase the right to use the KWRI operating system that was presented to them when they joined the system. While there may be leadership changes, due to the number of different individuals involved in a franchise system, a responsible franchisor will minimize changes to the operating system, and communicate changes clearly and ahead of implementation. Franchises thrive in stability. On information and belief, Gary Keller often threw franchisees into disarray in bad faith by not clearly communicating changes in the system in an effort to destabilize and devalue the individual franchises.

operated Regions and their Market Centers, and they must comply with his threats or have the actual owners of these so-called independent Regions and Market Centers removed from their leadership positions. Their reason for removal being simply disagreeing with Gary Keller, as was evident when Gary Keller had Plaintiff Herfel removed from his leadership position simply because he disagreed with Keller's campaign to reduce caps.

49.     KWRI also franchises hundreds of Market Centers[4], which are overseen by their corresponding Regions. While Gary Keller does not own interests in the individual Market Center franchises, he nonetheless exerts full control over each Market Center through constant directives and mandates, and, if such directives are not followed, threats to have owners removed from the independently owned and operated Market Center and/or Region.

50.     Indeed, on information and belief, Gary Keller and his associates have sent numerous letters of non-renewal to independent owners and operators refusing to renew their license as a result of supposed "non-compliance" when a franchisee refused to cooperate with a Keller mandate. Further, when an owner refuses to comply, Gary Keller initiates a full-fledged smear campaign against that individual within the investment group of the Region or Market Center to create an environment which is so hostile as to constitute a constructive ousting from the KWRI system as a whole.

51.     KWRI has remained a private company throughout the entirety of its existence, and has adopted a strategy of rapid growth of its touted franchise system, while also imploring strategies of increasing KWRI's own bottom line by forcing franchisees to pay for products and services, at inflated prices, from companies also founded and owned by Keller. While not presented as "required" when purchasing a Market Center or Region, Keller and KWRI push out

---

[4] To date, there are more than 800 Market Centers throughout the United States and Canada.

and ostracize Regional or Market Center owners and who refuse to purchase these products.

52.     These measures have been adopted, on information and belief, to increase Gary Keller's and KWRI's profit, inflate KWRI's supposed profitability, and therefore make it more attractive to potential Market Center and/or Regional owners and investors, toward the ultimate goal of having others build up the franchises, only to have Gary Keller or his partners to repurchase the entities at a deflated price and therefore retain complete control over the entire KWRI franchise model.

53.     Additionally, Keller Williams has not only touted itself as a real estate company, but also as a technology company. In doing so, Keller Williams has forced independently owned and operated Regions and Market Centers to use the technology, whether effective or not.

54.     To effectuate the notion that Keller Williams is a "technology" company, Keller Williams further forces independently owned and operated Market Center owners and their agents to pay an ever-increasing technology fee, on top of an armada of other fees every month. In the past six months, the mandated monthly technology fee has more than doubled, going from $25 per agent to $51 per agent, and has yet again increased to $65 per agent, resulting in approximately $80.6 million per year gain on the increase alone.

55.     On information and belief, KWRI has plans to increase the fee to $150 per agent per month by 2025.[5] Thie income from the technology fee alone would then be roughly $302.3 million per year. However, on information and belief, Gary Keller has done nothing but pocket the increased technology fee for quite some time.

56.     Moreover, agents must adopt and pay for the Gary Keller-mandated technology

---

[5] On information and belief, Gary Keller has stated that he personally funds KWRI's technology, despite massive technology fees being collected from franchisors. This only demonstrates further that Keller, on information and belief, believes that KWRI's money is his personal money.

in order to remain in compliance and to be compensated upon closing of their transaction.

57.     Most agents do not want to use the technology, and the constant requirement to do so contributed to the loss of many KWRI agents.

58.     At the KWRI leadership meeting held with Regional and Franchise Owners in October 2022, Gary Keller stated that the technology fee needed to be increased to continue to improve the technology. However, it has been over a year and there is no noticeable difference in the technology.

59.     Gary Keller, who is not particularly astute to technology, partnered with Team regarding "technology" at KWRI. Team, on information and belief, wanted to get on Keller's good graces, and made large promises to Keller as to new kinds of technology that could be delivered. Gary Keller, however, never thoroughly inspected Team's work.

60.     Gary Keller gave Team a fortune to produce technology, which Team irresponsibly and selfishly squandered. Indeed, when Keller and Team's work was "completed," and after Team's departure from KWRI, his ruse was discovered as two individuals from KWRI themselves said that there was no possible way to make the technology useful or of any sort of value.

61.     Gary Keller and Team therefore saw hundreds of millions of dollars go towards technology that could not be used. However, they *also* saw hundreds of millions of dollars in technology fees collected from franchisees, which, if not put towards technology, could be individual profit for Gary Keller.

62.     On information and belief, when Team's technology failed, KWRI continued to collect, and even increase, the technology fee to independently owned and operated Market Centers, and instead of putting that money towards new technology, Gary Keller pocketed the fee for himself.

63.     Gary Keller and Team implemented notions of KWRI being a technology company to justify increased investment dollars by Market Center owners, and to extract exorbitant technology fees from independently owned and operated Market Center owners, cutting into their hard-earned profit.

64.     The technology fee is also a source of contention between independently owned and operated Market Centers and some of their agents, as the agents felt "why should they pay the fee, when the technology was an embarrassment to some of their businesses."

65.     The independently owned and operated Market Centers had to spend their political capital to retain agents and clean up Gary Keller and Team's mess, because the technology did not work.

66.     For years, KWRI has continued and even enhanced its deceptive and fraudulent practices with respect to its franchisees, which allow it to extract hundreds of millions of dollars from franchisees while simultaneously making it incredibly difficult, *if not impossible*, to operate profitably.

67.     For example, Herfel and his Market Center agents found it impossible to run the day-to-day operations with Gary Keller's technology. Herfel's agents noted that the technology was never functional. While the agents want the ability to purchase their own technology and programs, they are unable to do so (and were never made aware of this before joining KWRI) because they must use Gary Keller's technology in order to be paid.

## II.     PLAINTIFF DAVIS'S RISE TO SUCCESS AT KWRI

68.     Defendant Gary Keller previously hired a CEO to grow the business by increasing agent count. This CEO was rewarded with a 10 percent stake of Keller Williams for increasing the agent count to a new higher level.

69.     However, it wasn't until after the 2008-2009 economic recession that Keller Williams' true growth and statute in the real estate business grew under the Growth Initiative led by Plaintiff John Davis.

70.     Davis's efforts to systematically grow Keller Williams focused on continually recruiting more agents by focusing on the market-based cap system at Keller Williams, which capped agent commissions to Keller Williams based on local market economics.

71.     This system was popular with agents, Market Center owners, Regional owners, and KWRI because everyone benefitted financially from this arrangement.

72.     In fact, from 2011-2018 Keller Williams was the darling of the real estate industry with high continual growth and accolades from throughout the industry was recognized with its first-ever 'triple crown' in real estate (most listings, highest volume, highest agent count) in 2017.

73.     Before becoming KWRI's CEO in 2017, Davis spent decades working in nearly every aspect of the business: Loan Officer, Agent, Team Leader, Market Center investor, Operating Partner, Regional Director, Regional Operating Partner, Vice President, and President.

74.     That experience gave Davis a unique perspective and deep, abiding respect for every type of business in a franchise company. Davis began his career in the real estate industry in 1996, at the age of 28 as a Loan Officer with Advantage Mortgage, a company owned by Keller. Davis then became a real estate agent for KWRI. Later, Davis became a Team Leader, taking a struggling Market Center with a mountain of debt to the third most profitable Market Center in the Keller Williams system. Davis was also named to the KWRI Team Leader Hall of Fame, and, in 2011, was awarded the President's award for Entrepreneur of the Year.

75.     Davis also became a well-respected operator and investor of multiple KWRI Market Centers and Regions throughout the country.

76.     In 2011, Davis was named Vice President of KWRI, where he pioneered KWRI's Growth Initiative, which focused on helping independent franchisees grow within the industry while creating a healthy, profitable real estate ecosystem that benefitted all parties.

77.     As President and CEO of KWRI, Davis implemented strategies that protected Market Centers' businesses, while also respecting that they were individually owned and operated. Davis empowered businesses with the greatest possible advantages for support, service, market share, and growth opportunities.

78.     Davis did not want agents to be dependent on Keller Williams. Instead, he wanted to teach them to grow their businesses interdependently. Davis's strategy was highly successful in accomplishing just that, as Market Center and Region profitability soared under Davis's direction, and agent sales units were at their highest in the history of the company as well.

79.     It was due to this growth strategy and Davis's strong leadership that KWRI became the fastest growing real estate franchise in the world. Indeed, under Davis's leadership, from 2011-2018 the number of real estate agents employed by KWRI more than doubled to approximately 187,000 agents.

80.     Davis led company-wide growth from 2011 to 2018. Under Davis's partnership with the individually owned and operated Market Centers and Regions the agent count almost tripled. It was a partnership that created a win-win-win. This agent growth, which led to record setting consistent profit that has not been seen before or since, attracted 145 Market Centers.

81.     The growth of independent Market Centers under Davis's leadership allowed the owners of these Market Centers to reap record high owner profit. These leadership decisions at the independently owned and operated local level created highly productive environments in which agents were empowered to set, track, and achieve huge goals. Profit Share for the agents exploded.

82.     In turn, KWRI's Royalty was also at an all-time high. Under Davis's leadership, the system worked for everybody. Defendant Gary Keller appointed Davis to President in 2015, Co- CEO in 2016, and sole CEO in 2017.

83.     Gary Keller and KWRI may claim that the market is currently driving down profitability across the board, however, the Keller Williams model is actually built for different markets. An examination of the activities will show that it is Keller's leadership driving down profitability, not the market. Davis knows this personally because the Growth Initiative was actually launched during the worst economic downturn since the Great Depression and Davis led businesses to grow.

84.     The independently owned and operated Market Centers' growth became a standout in the industry. The industry recognized this success and named Davis to numerous third-party lists of top executives across all industries. Most importantly, Keller Williams associates named Davis the number 30 CEO across all industries by Glassdoor in 2018 with unsolicited reviews.

85.     The incredible growth of the independently owned and operated Market Centers by agent count, agent productivity, and profitability made Keller Williams a top workplace.

86.     In 2018, the success of independently owned and operated Market Center operators working alongside Davis, not for Davis, led to Davis being named the seventh Most Influential Person in Real Estate. Davis did not speak much about this, however, because Davis knew it was about the people, not him.

87.     In summation, Davis's leadership led to a thriving and productive workplace environment at Keller Williams, which led to financial growth and opportunities for all in the entire Keller Williams ecosystem. Inevitably, however, this growth led to more money for the founders of KWRI, namely, Defendant Keller. With hold of more money, greed took a hold of Keller shortly

thereafter, and what once was a top, sought-after workplace turned into what can only be likened to a criminal enterprise that Davis could not stand for.

88.     Despite the universal success of Keller Williams agents, market centers, and regions during this period, defendant Keller devised an illicit scheme to tilt proceeds back upstream to himself, his co-defendants and hand-chosen favorites that would erode the value of market center ownership.

89.     Although KWRI and Gary Keller reaped huge financial rewards from Davis's Growth Initiative, strategies, and leadership, among other things, Keller did not want Market Center owners to share the newfound wealth—instead, Gary Keller wanted this wealth for his own. Keller's leadership is intentionally driving down profitability, and not the state of the market.

90.     Defendant Gary Keller declared "market centers have no value" and brought in a host of other named defendants to work to consistently diminish and undervalue market centers and prove that once-profitable locally owned and operated market centers would have no value, depriving market center owners of the investments and holdings.

91.     Keller devalued other's property and hard-earned businesses for his own gain and the gain of his co-defendants.

92.     Indeed, when Keller noticed just *how much* money he could make by retaining control of the franchise branches, even by improper or otherwise illegal means, the KWRI motto has changed from "where entrepreneurs thrive," to Defendant Keller and Team's new personal motto of "why buy what you can steal."

### III.    **PLAINTIFF HERFEL'S HISTORY AND SUCCESS AT KWRI**

93.     Herfel's time at KWRI dates back to 2001, when he joined the company as a real estate agent.

94.     Herfel experienced immense success as an agent, and was in Gary Keller's Top 100 Agent Mastermind Group from the year that he started at KWRI.

95.     Due to his role as a top agent, Herfel was highly involved in the KWRI culture, paid for MAPS coaching, the Mastermind group, Trainings, books, Mega Camps, Family Reunions, and other various KWRI events/trainings for over 20 years.

96.     In 2017, Herfel purchased 20% of a Market Center in Arizona and became the Market Center Operating Partner at that time.

97.     Herfel and his wife launched a Market Center that created massive growth, and reorganized the entire leadership team. Herfel took the Market Center's agent count from 209 to 408 at its peak and drove the closed sales volume from $445 million to $1.5 billion.

98.     In 2018, due to the demand, Herfel identified and negotiated a new location to move the Market Center to.

99.     In doing so, Herfel took a Tenant Improvement loan of approximately $800,000, which Herfel personally guaranteed.

100.    In 2018, Herfel was offered, and accepted, the role as the Regional Director for the Southwest Region of KWRI. Herfel served in this role util February of 2020.

101.    The Southwest Region of KWRI is comprised of over 20 independently owned and operated Market Centers throughout Arizona and Nevada.

102.    As Regional Director, Herfel served as an agent of KWRI who would oversee the operations of the Southwest Region as well as the Market Centers.

103.    Herfel and his wife also owned a Market Center within the Southwest Region.

104.    For much of the time that Herfel was Regional Director of the Southwest Region, he worked alongside Davis, who served as the Operating Partner of the Southwest Region.

105.    Together, Herfel and Davis had a plan and vision to grow the Market Centers in the Region in agent count, provide better than ever industry training, education, and support for franchise owners, and reduce expenses through negotiating lease rates, among other things.

106.    Under this model, it was a win for all involved, including the Market Centers, the Region, as well as KWRI—increased production for the agents, increased profitability for the Market Centers, and increased royalties for the Region and KWRI.

107.    This model changed in January 2019, however, when Davis resigned as CEO and therefore Davis also no longer served as Operating Partner of the Southwest Region.

108.    When Davis resigned, Defendant Gary Keller stepped in as CEO, Chairman of the Board, as well as Operating Partner of the Southwest Region (and all other Regions which Davis owned). As a result, Herfel then reported directly to Gary Keller.

109.    Throughout 2019, Herfel and Gary Keller had numerous conversations via phone call, in person, and email about the vision and strategy for growth and profitability of the Market Centers in the Southwest Region.

110.    Herfel's personal vision for the Region was to bring Market Center Operating Partners to work together throughout the Region in order to increase productivity, engagement, and overall profits.

111.    In the Summer of 2019, Gary Keller created six new roles at KWRI called the "Divisional Leaders."

112.    Each Divisional Leader was to oversee and work with the Regional Directors and Owners of the given Region.

113.    As the year progressed, the conversation and directives from Gary Keller to Herfel continued to change.

114.     Indeed, Gary Keller's changing directives had no consistent path forward, aside from two topics: technology and reducing caps.

115.     As to technology, Gary Keller continuously stressed to Herfel and other KWRI members every 30 days how great the KWRI technology was and how many improvements had been made since they last met.

116.     However, these technology sentiments were far from true. In reality, the technology never worked the way Gary Keller said it would.

117.     Nonetheless, Herfel and other Regional Directors were directed by Gary Keller to push adoption of the technology within their Regions.[6]

118.     While adoption of Gary Keller's technology was met with major resistance from Market Center owners due to its lack of functionality, they were forced to adopt it as this was the only way for agent's transactions to be in compliance with KWRI mandates and to receive commission checks.

119.     In other words, if a Market Center refused to adopt and pay for Gary Keller's technology, it simply would not get paid.

120.     As to lowering caps, Gary Keller focused on this notion in every meeting he had with Regional Directors.

121.     Further, in an effort to effectuate the scheme, Matt Green came up with, created, and pushed a spreadsheet which "justified" Gary Keller's directive to lower caps universally to $10,000, despite the claim that these Market Centers were supposedly independently owned and operated.

---

[6] Regions were also required to hire a Regional Tech Trainer to promote Gary Keller's technology. However, because the technology did not work, the Regional Tech Trainers had to use screenshots and PowerPoint presentations rather than live demonstrations in order to push a false premise of functionality.

122.     Matt Green and Marc King together pushed Green's spreadsheet on Regional leaders in furtherance of the scheme.

123.     Gary Keller's initial push included directing individually owned and operated Market Centers to take an initial profit hit with the promise they would supposedly recoup their losses. With this push, Keller purposefully put other people's money at risk. This was not his money to gamble with.

124.     There was pushback against lowering caps because Market Center owners had signed lease agreements, loans, and personal guarantees in place that could not be modified for 5-10 years. Reducing the Caps would financially destroy the Market Centers.[7]

125.      In response to Gary Keller's directives, Herfel had multiple conversations with his Divisional Leader, Smokey Garrett, who shared Herfel's sentiments and told Herfel, "whatever you do, do not reduce the caps."

126.     In November 2019, Herfel attended a Regional Directors meeting, where he spoke to Gary Keller and stated that he was against a universal reduction of Market Center caps due to the Southwest Region's financial devastation when it previously attempted to lower caps.

127.     Once Herfel voiced his opposition to Gary Keller's scheme, the relationship between Herfel and Gary Keller completely changed—Herfel no longer fit Gary Keller's agenda, and as a result, Gary Keller set out to have Herfel removed from his leadership position.

128.     Indeed, on information and belief, Gary Keller openly stated that anyone who did

---

[7] Herfel was personally familiar with the financial repercussions associated with reducing Market Center caps due to the fact the Southwest Region had once lowered its caps at Gary Keller's directive in an attempt to recruit more agents, and never financially recovered. Around 2007, the Southwest Region, which once was the leading Region within KWRI in profits, reduced its caps from $18,000 to $15,000 (a 17% reduction). Gary Keller thus had knowledge that lowering caps only drove Market Center profits down. An additional and even larger reduction from $15,000 to $10,000 would surely be financially devastating to the entire Region.

not support his cap directives "did not need to be in leadership positions" at KWRI.

129.     In January 2020, Gary Keller sent Herfel an email stating that Matt Green, who was Gary Keller's poster child for reducing caps, would now be the Operating Partner for the Southwest Region, and that Herfel would now report to Green instead of Garrett.

130.     When Gary Keller appointed Green to the Operating Partner position, he did so with the directive to fire Herfel as Regional Director.

131.     Within a few days, Green came to Herfel's office and asked him to lunch.

132.     While at lunch, Green informed Herfel that KWRI was going in a "different direction" with the Southwest Region, despite Herfel's major success leading the Region, and that Gary Keller had someone waiting in the wings to replace Herfel immediately.

133.     Herfel, blindsided, walked Green through the finances of the Southwest Region, demonstrating the Region's success under his leadership. In response, Green asked Herfel if he wanted to "fight for his job," to which Herfel responded affirmatively.

134.     After Green left, Herfel attempted to reach Gary Keller by phone, text, and email, but received no response for days.

135.     Gary Keller then finally emailed Herfel back a few days later, only offering Herfel a severance, and refusing to allow Herfel to keep his job.

136.     Under extreme duress regarding the ability to support his family, Herfel signed the severance.

137.     On information and belief, this was all done solely because Herfel refused to support Gary Keller's directive to lower Market Center caps.

138.     Incredibly, despite being fired, Green requested that Herfel attend a KWRI event to announce that he had "stepped down" to create even more of a false narrative of Gary Keller's

manipulative tactics.

139.    Additionally, despite being fired, Herfel still owned a Market Center within the

Region, and was subjected to Gary Keller's leadership scheme until he could find a way out.

## IV.    BECAUSE OF KELLER'S GREED, KWRI WENT FROM WIN-WIN-WIN UNDER DAVIS, TO LOSE-LOSE-WIN AFTER DAVIS RESIGNED AS CEO

140.    After Davis resigned as CEO of KWRI, Gary Keller stepped in and devised a plan

to control and take back profit from the independent Market Centers.

141.    Ever since Gary Keller's greed took hold of him, he and Defendant Team have

combined to create an enterprise which houses three main cyclical components: (1) induce

franchisees to purchase Market Centers and/or Regions in order to build up the new business; (2)

devalue the franchise by means of charging unnecessary fees and slashing owner profits; (3) when

the business is facing financial hardship due to KWRI undermining control of the Market Center

or Region, and the owner has no choice but to sell, refuse to approve the sale to an independent

third-party, and instead demand that the sale be made to Keller and/or his associates at a price

much lower than fair market value.

142.    KWRI undermines independently owned and operated Market Centers by

tortiously interfering with independently owned and operated investment groups, intentionally

creating chaos to pit the independently owned and operated Market Centers against each other and

forcing out Market Center leadership in bad faith for improper purposes, so that in their weakened

state, Keller and his associates can demand that a sale be made to them at a price that is criminally

low.

143.    Defendants' "why buy what you can steal" scheme affects and destroys the

livelihood of those that entered the KWRI system in the hopes of becoming a successful,

independent entrepreneur, and instead is akin to a pyramid scheme where the only one that benefits

is the person at the top: Gary Keller/KWRI.

144.    It is through this scheme that Defendants maintain control and ownership over the entire franchise system and saddle the owners of independently owned and operated Market Centers with debt against their will, so that the owners have no choice but to either sell back to Gary Keller and his associates or keep paying Gary Keller his mandated fees in order to avoid legal consequences.

145.    In order to effectuate this scheme, Gary Keller thought up a plan which would increase his and KWRI's bottom line, but drastically cut franchisee profits: lower the Market Center cap[8], charge Market Centers an increasing technology fee, and force franchisees to purchase

---

[8] The insistence by Gary Keller to lower Market Center cap was not for the benefit of any individual franchise, but instead, was largely driven by his paranoia of a new company, eXp, which had lower caps than KWRI, taking KWRI's place in the industry. On information and belief, Keller was also jealous that eXp was getting attention as an innovative model, which Keller felt took away from his luster as a real estate "genius." Keller was fixated on eXp and could not stop talking about it. His paranoia was so great that when a top producer from KWRI left to go to eXp, Keller overgeneralized it as a movement and spoke about it constantly. Davis would tell Keller that the reason why a "Pirate", who was one of Keller's special group of elite agents, was lost to eXp was because of Keller's relationship with the top producer, but also Keller's fear of eXp generated curiosity in the top producer. On information and belief, their thinking was that if Keller was so afraid of it, it had to be good. Keller was essentially the best recruiter for eXp, though Keller would say it was the ineptitude of the independently owned and operated Market Centers that caused the loss. Defendant Keller was essentially hosting an eXp seminar when he would talk with his "Pirate" group. These sessions were otherwise focused on anything under the sun to help their businesses from masterminds on how to build teams to Keller personally doing seminars on how to keep commissions. Keller personally led seminars on how to set and keep real estate commissions.

Notably, this paranoia over eXp was not even driven by real market concerns, but was, on information and belief, due to the fact that the individual that founded eXp was a former KWRI "Pirate" who had resigned. Further, eXp is not a franchise system, but rather is a single brokerage. Thus, eXp and KWRI cannot feasibly operate in the same manner. Unlike eXp, KWRI's Market Center cap belongs to the Market Center. As a brokerage, eXp could set caps for all of their offices. In other words: Keller was willing to lie to and sacrifice all of his franchisees to save himself and take down one person—the individual who dared leave Keller Williams. Indeed, when Keller feels that he has been slighted in any magnitude, whether it is someone wanting to work with someone other than Keller or someone leaving his company and having success, Keller, on information and belief, seeks to target and destroy that person at all costs, even if it would hurt his own people.

Additionally, at the time Keller mandated that caps be reduced, many Market Centers already had lower caps than eXp. For example, Herfel's Market Center had a $15,000 cap, and eXp had a $16,000 cap. This clearly shows Gary Keller's interest in devaluing the Market Centers within KWRI—reducing caps with owners paying brick and mortar expenses like buildings, offices, royalties, support staff, technology fees,

goods from Keller-owned businesses, such as MAPS coaching in order to take back the growth and profits of Market Centers realized under Davis's tenure.

146.     Indeed, the Regional calls and weekly growth calls run by Gary Keller are aimed at creating the groundwork to reduce caps and push Keller-owned companies and services such as 72Sold, RISE, Sectors, MAPS coaching, and many other companies which Gary Keller continues to create.

147.     Herfel's Market Center, for example, was required to carry four MAPS coaching contacts (one for Operating Partner, Team Leader, Market Center Administrator, and Productivity Coach), which cost the Market Center $5,500 per month. Gary Keller was therefore bringing in $53 million per year from Market Centers on required coaching for leadership alone.[9]

148.     Additionally, when an agent was considered a "top agent," that agent was required to become a MAPS coach, attend mega skills camp, and take on two coaching clients in order to stay in the top agent group. This costs each agent thousands of dollars, which goes directly into Gary Keller's pocket.

149.     Indeed, dating back to 2017, Keller began emailing and speaking with Davis insisting that market caps be lowered by the independently owned and operated Market Centers in order to "recruit agents."

150.     From understanding the economics of the Market Center, Davis was most worried that cutting the cap would diminish Market Centers' ability to provide the quality support that agents deserved. Davis believed agents deserved support in capping as quickly as possible so that their income was unlimited. This created a win-win-win. The system worked.

---

books, events, etc. which eXp does not have to account for.

[9] $5,500 for 4 contracts x 12 = $66,000 per Market Center per year. With approximately 802 Market Centers throughout the country, this results in a total profit of $53 million per year.

151.    However, directing reduced caps created a lose-lose-win. A loss for the Market Center, a loss for the agent, and a win for Defendant Keller, because KWRI's Royalty did not change. On the other hand, Keller directing reduced caps to businesses that were not his own, that he did not operate, created a lose-lose-win: a loss for the Region, a loss for the Market Center, a loss for agents (though they might initially appreciate a lesser cap, they will get exponentially less in being denied the support and services they deserved to achieve their greatest success), and a win for Gary Keller.[10]

152.    For years, Davis resisted Gary Keller's insistence on lowering Market Center caps.

153.    Among other things, Davis believed it was an infringement on the rights of Market Center owners because, until that point, independently owned and operated Market Center owners had been permitted to set their own individual caps in light of the individual market, taking numerous factors into account.

154.    Davis believed in respecting the owners' ownership and operation. Davis was concerned that circumventing the licensing agreement and mandating a universal cap would violate franchise law and KWRI's role as a franchisor, crossing the line into becoming a de facto broker. Keller wanted to operate Keller Williams as a sole broker, not a franchise.

155.    Gary Keller himself, Chairman of the Board, when he had the coveted Triple Crown in real estate (number one in agents, number one in sales units, number one in sales volume)

---

[10] For example, Herfel's Market Center owner profit versus KWRI royalties is a clear demonstration that the cap reduction benefits Gary Keller while crippling Market Center owners:
- 2017: Royalties were $369,390 while Owner Profit was $268,423
- 2018: Royalties were $341,486 while Owner Profit was $124,177
- 2019: Royalties were $394,776 while Owner Profit was $168,450
- 2020 (*when caps were reduced*): Royalties were $535,482 while Owner Profit was $238,704
- 2021: Royalties were $580,401 while Owner Profit was $181,474
- 2022: Royalties were $584,498 while Owner Profit was $172,270.

believed and stated that franchising was dead.

156.     Indeed, determining a Market Center cap requires a careful business analysis that incorporates the needs and expectations of individual markets and in the independently owned and operated Market Center, a consideration of current and future expenses as related to agent leadership, space, service, and support, and a realistic analysis of recruiting capabilities and attrition rates.

157.     To simplify, if a Market Center owner decides to reduce their cap by half, they have just reduced their income by half. They would need to then recruit double the number of productive agents to continue at the same level of profitability. If they do not recruit the number of productive agents they need, at the pace they need, they may need to reduce the leadership, space, service, and/or support they provide to agents.

158.     This may further impair their ability to recruit productive agents at the pace they need. This equation is further complicated by the fact that if they are competing on cost, they are recruiting agents whose main concern is cost, not production. These agents may not be interested in building businesses and therefore may only pay a portion of the cap (if any) per year. Clearly this was not a win for the independently owned and operated Market Centers as the numbers have borne out.

159.     Further, nothing in the individual franchise agreements gave Keller or KWRI the power to set market caps themselves for the independently owned and operated Market Centers. Indeed, in recommending specific and universal Market Center cap amounts, Keller was overstepping the franchisee's role in leading an independently owned and operated Market Center.

160.     Davis tried to push back on Keller's idea because the strategy would not only hurt Market Centers, but Davis believed it would not set the right example, as an investor in multiple

Market Centers and Regions. If Davis had gone along with Keller's strategy, Davis believed that it would harm operators and diminish their futures, as well as harm agents immediately and long-term.

161.    Despite Davis's resistance, Keller demanded that universal caps be recommended.

162.    Due to this conflict in morals and strategy, Davis felt he had no option but to voluntarily resign from his position as CEO in January 2019.

163.    Davis hoped that his resignation would send off a warning flare about the consequences of cutting caps in half and ignoring the independent nature of the Market Centers and Regions. Davis further hoped that his resignation would cause Keller to rethink his strategies and put all businesses, including agents, investors, and operators of independently owned and operated franchises first.

164.    Unfortunately, however, after Davis's resignation, Gary Keller's behavior and scheme only worsened. Davis, as an individual who helped build KWRI into the empire that it is today, and who deeply cared about each and every one of the independently owned and operated franchises and each of the agents in those offices, was deeply hurt to watch Gary Keller's ruthless, deceptive practices take hold.

165.    Once Davis resigned, Gary Keller began a full-fledged campaign to devalue Davis's investments and take him down in the industry. On information and belief, in Gary Keller's eyes, no one leaves KWRI voluntarily without punishment and being smeared. Indeed, Gary Keller employed an active campaign to disparage Davis.

166.    For example, shortly after Davis left, Gary Keller insisted that the entire KWRI system was "broken," thereby implying that Davis broke the system, and that Keller was the hero coming to save the day. However, this could not have been further from the truth.

167.    Moreover, in ongoing efforts to devalue the franchised business holdings of others, Defendant Gary Keller, his co-defendants, and hand-picked favorites further engaged in the illicit scheme after Market Centers were coerced into lowering their caps.

168.    Lowering caps created a profit crisis in Market Centers whereby profits dropped an average of 50 percent; indeed, upon information and belief, current market center profit margins hover around 1 percent.

169.    Notably, while Gary Keller exerts power and control over Market Centers and agents as if he is an employer by, among other things, demanding a unilateral cap reduction, he refuses to take responsibility for the ongoing profit crisis. Indeed, to Gary Keller, Market Centers are only "independent" where it serves him.

170.    Additionally, not only did reducing caps cripple Market Center profitability, but Gary Keller also mandated that Market Centers hired a Market Center Tech Trainer to the payroll. The motivation was clear: increase Market Center expenses, decrease Market Center revenue.

171.    A Market Center's lack of profitability can actually put a Region into default and become a major franchise agreement compliance issue. By putting a Market Center into default, it can trigger a potential upstream default for the region it resides in within Keller Williams.

172.    Defendant Gary Keller, his co-defendants and Keller Williams Legal Department have further eroded the structure of independently owned and operated Market Centers by unilaterally implementing rolling one-year agreements based on goals set not by the independently owned and operated market center but instead by Defendant Gary Keller and his co-conspirators.

173.    Furthermore, Regional Operating Partners have also been given unilateral, specific goals set by Keller Williams and its legal department and are instructed to sign new agreements. Market Center and Region agreements have become rolling one-year agreements

rather than the ten-year agreements stipulated in the franchise agreement. Market Center owners that are unable to meet the unilaterally set goals face default in their agreements rendering their holdings worthless and bringing to fruition Keller's belief that market centers have no value. The threat of default to Market Center or Region renders the holdings worthless and subject to takeover by Keller in the ethos of 'why pay for something you can steal.'

174.    Defendant Gary Keller has constructed a means by which to generate performance and profit issues for Market Centers. These goals include profitability metrics impossible to meet through the defendants' insistence on lowering caps and the continually increasing costs for Keller William's worthless software and overpriced training materials. By weakening Market Centers financially that in turn creates more compliance issues for a region. A Region that has significant Market Center compliance issues can be placed in default.

## V.    DEFENDANTS' FRAUDULENT MISREPRESENTATIONS TO REGIONAL AND MARKET CENTER OWNERS

175.    At the same time that KWRI solicits franchisees to enter into unconscionable franchise agreements, it engages in a practice whereby it extracts substantial fees and payments from franchisees, in exchange for the ability to operate a franchise that KWRI: (i) knows, or should reasonably know, will likely fail to be profitable; and (ii) intends to maintain control of, and buy back at a deflated price, thereby retaining control of the entire franchise system.

176.    On information and belief, when speaking to potential franchise owners, KWRI did not report the likelihood of business failure, underreported the number of failing Market Centers and/or Market Centers in existing default under the licensing agreement, and further did not disclose that KWRI and Keller would habitually interfere with the sale of independently owned and operated Market Centers in an effort to further devalue the businesses and purchase back the franchises at a deflated price.

177.     KWRI intentionally failed to disclose these truths to prospective franchisees to conceal and prevent prospective franchisees from obtaining information that would enlighten them to the true risks involved in owning or operating a KWRI franchise, the very likely potential for partial or complete loss of capital invested in the franchise system, and the lack of real opportunity to be a successful and profitable independently owned and operated business owner.

178.     KWRI also concealed that that KWRI and Keller had plans to manipulate the cap system since 2017—the very system which once gave franchisees the ability to run their independently owned and operated business freely according to the location and market.

179.     In early 2019, Keller recommend that Market Center owners reduce their caps in order to recruit top agents and in turn increase profitability. Increased profitability, however, was a false premise.

180.     While this cap reduction was not "mandatory" by its terms, those who refused were ostracized and pushed out of their leadership positions and possibly their ownership positions within the KWRI system.

181.     On information and belief, Keller knew that by reducing Market Center caps, independently owned and operated Market Centers would lose profitability, and therefore those independently owned and operated Market Centers would lose value. Indeed, on information and belief, Keller even agreed to cover some of his chosen franchisees' losses if they agreed to reduce their caps, in the hopes that others would file suit.

182.     Of course, Gary Keller and KWRI did not disclose that to the hundreds of unknowing Market Centers. Keller sent Regional Representatives ("Regional Directors") to individually owned and operated Market Centers in an effort to deceive those Market Center owners under the guise that it would increase growth and profit.

183.    On information and belief, Keller misrepresented the negative impact that reducing caps would have on Market Centers by purchasing a number of Market Centers, changing the caps, and hiding that the Market Centers were not making money in order to demonstrate proof of concept.

184.    In order to convince Market Centers to lower their caps, Gary Keller stated in emails to franchisees that in return for reducing their cap, he and Team would replace the local level's resources with technology and in turn help grow the Market Center. However, this was a false promise.

185.    Moreover, technology does not replace agent services that the cap paid for. Indeed, the KWRI app did not make KWRI agents better, and on information and belief, hurt agent businesses due to glitches and bugs.[11]

186.    Gary Keller therefore convinced franchises to reduce their revenue to benefit himself, promising to deliver technology in return. Meanwhile, Gary Keller kept his revenue and did not lower his Royalty caps.

187.    However, the technology that Gary Keller promised cannot and did not increase an individually owned and operated Market Centers' revenue.

188.    Worse, upon information and belief, Defendant Gary Keller pocketed the fees entirely or partially for himself.

189.    Further, when independently owned and operated Market Centers did succumb to Gary Keller and Josh Team's pressure to reduce their caps, thereby demolishing their individual profits, this devalued the Regions where those Market Centers were located as well.

---

[11] Keller has even admitted at times that the company was losing its "war on [software] bugs." See Keller Williams' tech pivot wins over fans, but could face hurdles, Inman (Aug. 26, 2021), available at https://www.inman.com/2021/08/26/keller-williams-tech-pivot-wins-over-fans-but-could-face-hurdles/.

190.     On information and belief, this scheme was created by Keller in an effort to devalue the very businesses that had been previously built up, so that Keller and his team could repurchase the independently owned and operated Market Center and Regions for themselves.

191.     Indeed, when a Market Center or regional owner attempted to sell the inevitably failing and damaged business to an outside individual, Gary Keller time after time stepped into and halted the sale, thereby demanding that the business be sold to him, his partners, or his allies at an even lower price. This was part of Gary Keller's scheme to take back the profits of Market Centers that had grown under Davis's leadership.

192.     At no time, however, was it disclosed to franchisees that KWRI would utilize its contractual right to pre-approve any sale in bad faith, leaving Market Centers owners stuck with a business that lost more money with each day.

193.     Through these and other deceptive practices, KWRI encourages and induces potential and existing franchisees to purchase what should be independently owned and operated Regions and Market Centers, before they can become aware of the true lack of profitability resulting from KWRI's fraudulent policies and practices, and the lack of freedom to even sell the franchise once it has proven a failure, or even if the owner faced outside circumstances which caused a need to sell the business, such as an owner passing away.

194.     However, owners are not able to freely sell their entity if it is successful or badly damaged—this is Gary Keller's rules, which are built on his whims, on what suits him at the moment. It is not based on a policy, performance, or anything tangible.

195.     Indeed, in a June 7, 2023 Regional Director meeting, Keller told Regional Directors to tell Market Center operators to "lose $200,000 this year in order to make $100,000 the next year, and $200,000 the following year." This statement was not true, and Keller knew, or

reasonably should have known its falsity. In that meeting, Keller also threatened Regional leadership, stating that he would take away their interest in the Regions if the Regions did not reach KWRI's unilaterally set goals.

196.    Further, on more than one occasion, Gary Keller threatened in the Regional Director meetings that, "if you don't grow, I will blow shit up."

197.    This statement by Gary Keller was understood to mean that if his directives were not followed, Gary Keller would replace those in leadership.

198.    Keller's misleading directives, on information and belief, not only run awry of his *own* business model, but are given for the purpose of further devaluing franchises with the objective of repurchasing them at a deflated price. Indeed, at one point Keller attempted to take KWRI public, as eXp had successfully done, but could not due to KWRI's lack of proper accounting. Gary Keller could not take KWRI public, so now, on information and belief, he wants to own everything.

199.    Throughout the implementation of their fraud and continuing until the present day, Keller and KWRI have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of preventing Plaintiff and other franchisees from becoming aware of their rights or otherwise dissuading them from pursuing legal action to vindicate those rights.

200.    The total ramifications of the unlawful conduct is not currently known, and it may take years to uncover the full extent of the harm to be suffered by franchisees due to Defendants' scheme.

## VI.    KWRI'S UNCONSCIONABLE FRANCHISE AGREEMENTS

201.    Based upon the misrepresentations stated throughout this Complaint, KWRI

exploits its overwhelming bargaining power to require franchisees to sign unconscionably one-sided franchise agreements, without any potential for negotiation of their terms. Most, if not all franchise owners are recruited from within the KWRI ecosystem, have never before owned an independent business, and are financially dependent on the KWRI ecosystem before they become owners of a KWRI franchise.

202.    These misleading and deceptive franchise agreements purport, among other things, (i) to give KWRI and Keller unilateral control over all significant aspects of franchisee operations, even as to items not expressly disclosed such as mandatory purchasing of trainings, Keller's books, events, and other KWRI materials; (ii) to disclaim any responsibility for the effect of KWRI and Keller's decisions and actions on the franchisees' success, profitability, or viability; and (iii) to restrict the ability of franchisees to litigate in their home states and to exercise their constitutionally-given right to a jury trial, and instead assign franchisees to arbitration and procedural rules designed to hide Gary Keller's and KWRI's misconduct.

203.    Further, the franchise agreement gives unconscionable, subjective control to KWRI regarding the sale of a franchise, which KWRI regularly exercises in bad faith. The Franchise Disclosure Document states that KWRI may require that:

> Each transferee has demonstrated to Company's satisfaction that transferee meets Company's subjective and objective criteria for new franchisees , including, but not limited to, Company's educational, managerial and business standards; transferee's experience, education, licensing, good moral character; background and record of compliance with laws and regulations, business reputation, transferee's general aptitude and ability to conduct the business of the Market Center (as may be evidenced by prior related business experience or otherwise); transferee's financial resources and capital for operation of the business; and transferee's geographical proximity to the Market Center.

204.    However, even when those "subjective" conditions are clearly met, Keller and his associates *still* improperly interfere and prohibit the sale of franchises, thereby unfairly restraining

free market competition and sales.

205.    Further, incredibly, the Franchise Disclosure Document also states:

Franchisee and/or each proposed transferee must establish to Company'
satisfaction that the terms, conditions and structure of the sale are substantially
commensurate with the fair market value for the purchased assets or interests and
allow for sufficient cash flow after payment of all ordinary and necessary business
expenses, including payment due to Company under this Agreement, to satisfy debt
service including without limitation any assumed or existing debt, to satisfy or
account for existing or potential liabilities, training costs and transferee's profit
expectations; provided that Company's granting of consent to any such transfer
does not constitute any representations, warranties or guarantees by Company
regarding the terms, conditions and structure of the sale.

206.    Despite requiring that sales must be made at fair market price, Keller and KWRI

prohibit and veto independent third-party sales at fair market prices, and instead demand that sale

be made to Keller and his associates at a price far below market value.

207.    While the licensing agreements state that a franchisee may sell the region or Market

Center to a *qualified* buyer upon KWRI approval (which in reality is Gary Keller's approval), this

provision is meaningless, because Gary Keller rarely, if ever approves a sale to a qualified, wholly

independent third-party. Instead, according to Gary Keller's playbook, he demands that sale can

only be made to himself and his allies, at his dictated price. Gary Keller's "why buy what you can

steal" campaign was a constant cycle of devaluing and punishing the individual, devaluing the

independently owned and operated franchise, and then taking the franchise as a whole for himself

and his affiliates.

208.    On information and belief, Gary Keller uses third parties to build up the location

of the franchise, but then seeks to recapture it for himself. Gary Keller runs KWRI as a real-life

version of the board game Monopoly, and Keller is always the one that gets to say, "do not pass

go."

209.    On information and belief, in furtherance of the illegal scheme, Defendants

manipulate the profits of independently owned and operated Regions and Market Centers by saddling them with unconscionable debt prior to the sale in an effort to justify the criminally low price that Gary Keller demands.

210.    On information and belief, Gary Keller has also manipulated the profits and losses of the Market Centers that he held ownership in and misrepresent profitability.

211.    The terms of the franchise agreements, included in the licensing agreement, franchise disclosure documents, and KWRI Policies and Guidelines Manual (which KWRI annually updates and uses as an extension of the franchise agreements in order to expand upon the terms of the original agreement), are, in combination, so burdensome for franchisees and so one-sided in favor of KWRI that they can only be seen as unconscionable and unenforceable.[12]

212.    On information and belief, KWRI is aware, or should be aware, of the unconscionability of its agreements. Indeed, this knowledge is demonstrated by KWRI's proposed shift in its Profit Share agreements with its agents. While for over 30 years, vested agents were able to keep all of their Profit Share when they departed from the KWRI ecosystem, the Profit Share agreements with the agents now state that if a vested agent transfers to a company outside of the KWRI ecosystem, 95% of that agent's Profit Share is kept by KWRI and put into a legal fund to *fight KWRI's own legal battles*. In turn, and true to Keller's playbook, the agent is punished

---

[12] On information and belief, KWRI is aware, or should be aware, of the unconscionability of its agreements. Indeed, this knowledge is demonstrated by KWRI's proposed shift in its Profit Share agreements with its agents. While for over 30 years, vested agents were able to keep all of their Profit Share when they departed from the KWRI ecosystem, the Profit Share agreements with the agents now state that if a vested agent transfers to a company outside of the KWRI ecosystem, 95% of that agent's Profit Share is kept by KWRI and put into a legal fund to fight KWRI's own legal battles. This Profit Share system with agents, who are independent contractors of Market Centers, is problematic in itself to various licensing laws across the country, thereby demonstrating KWRI's lack of regard for both franchising and licensing laws. For example, 19 NYCRR § 175.22 states that "No licensed real estate salesperson may own, either singly or jointly, directly or indirectly, any voting shares of stock in any licensed real estate brokerage corporation with which he is associated." By allowing agents to partake in Profit Share, and therefore have a portion of ownership in the company, KWRI runs afoul of New York State licensing laws. Other states across the country have similar provisions.

for leaving KWRI.

213.    The net effect on KWRI's franchisees of its approach to franchising is to ensure unconscionably overbroad contracts that purport to circumvent meaningful legal rights belonging to the franchisee, impenetrable systematic barriers to economic success for the franchisees, and negative incentives to pursue legal remedies to redress injuries caused by KWRI and Defendant Keller's conduct.

## VII.    DEFENDANTS EXPLOIT AND EXTRACT ENORMOUS FEES FROM FRANCHISEES

214.    Once the franchisees are captured into the KWRI fraudulent scheme, KWRI further traps and defrauds the franchisees by tying the ability to use the KWRI trademark and the ability to participate in the KWRI system to the purchasing of KWRI branded trainings and other materials, which are conveniently produced by companies owned and operated by Defendant Gary Keller.

215.    KWRI franchisees, however, enter into their licensing agreements with limited and deceptive information regarding the nature of these tying policies.

216.    While neither the licensing agreements nor franchise disclosure documents state that these Keller-owned products *must* be purchased, upon entering into the agreement, franchisees are "recommended" to purchase these materials and services, such as MAPS coaching and 72Sold.

217.    If a franchisee chooses not to purchase these materials and services, however, the franchisee was forcibly pushed out of the KWRI system, by means of removal of his or her position, and potential non-renewal of their individually owned and operated Market Center.

218.    KWRI requires franchisees to purchase certain goods and services, such as training for its employees/independent contractors from MAPS, from KWRI-approved vendors, which, conveniently, are all companies owned by Gary Keller himself and through which, Keller, Team,

and KWRI receive kickbacks from.

219.     In addition to MAPS and 72Sold, these companies also include, but are not limited

to, KWEN, Keller Mortgage and Mutual of Omaha Mortgage, Inc. (which purchased Keller

Mortgage and in which Keller has ownership interests), Keller Title, and KPA.[13] While not

disclosed in any of the franchise agreements, if these services are not purchased, negative action

will be taken against the owner and/or operator.

220.     Significantly, if Gary Keller owns a company that sells products or services,

franchisees are not permitted in this instance to obtain similar products and services from

independent third parties even when the products and/or services of independent third parties are

superior and/or less expensive.

221.     Indeed, Gary Keller has gone so far as to state from stage at KWRI events that if

Keller Williams agents do not promote his company Keller Mortgage, the agents are not honoring

their fiduciary duty to their clients.[14] Moreover, on information and belief, the prices charged by

Gary Keller for these goods and services are higher than franchisees could obtain from independent

third parties in a competitive market. On information and belief, KWRI does this due to Gary

Keller's belief that because KWRI is private, they can do what they want "with no penalty."

222.     Notably, however, these products of are no superior quality to those that could be

obtained from independent third parties in a competitive market. For example, MAPS "training

and education" offers no verified education—it is merely ideas that Keller has thought up on his

own or stolen.[15]

---

[13] In these instances, it is "recommended" that franchisees purchase from these companies directly, of which Keller receives the revenue as owner of these companies.

[14] Contrary to Gary Keller's assertion, Market Centers and their agents do not have a fiduciary duty to promote Keller's side- hustle businesses.

[15] Indeed, Dianna Kokoszka, who at one point was CEO of MAPS, wanted MAPS to include additional and

223.    Through this scheme, KWRI, Gary Keller, and his affiliates reap substantial revenues and profits that come at the direct expense of its franchisees.

224.    This deliberate coercion, carried out using threats and intimidation, creates a hostile environment where franchisees and their invested capital are preyed upon as the most important and most dependable source of revenue and cash flow for the franchisor, with an eye on recapturing a built up business at a much lower price, with little to no concern for the franchisees' positive cash flow generated through the sale of real estate under the KWRI name.

225.    Indeed, Defendants have reaped hundreds of millions of dollars from the "required" purchases of the franchisees from Keller-owned companies. Moreover, once franchisors become aware of this fraudulent scheme—which forces them to purchase overpriced or inferior products or services, and the unconscionable terms of the franchise agreement, including Gary Keller's control over the resale of the entity makes it nearly impossible to exit KWRI with any kind of profit.

226.    Additionally, as stated above, Gary Keller and Team, who collectively form the "technology team" at KWRI, have consistently raised the monthly technology fee to Market Center owners over the years, however, there has been *no demonstrable change or improvement in KWRI's technology.*

227.    On information and belief, Keller himself has pocketed the increase in the technology fee—a use of funds that is not designated in the franchise agreements—in order to

---

different thoughts and ideas from different companies and different industries, and therefore had different approaches to real estate than what was originally being taught by Keller through MAPS. Even though Kokoszka was wildly successful and built MAPS into a powerhouse and world-class organization, when she attempted to bring these new ideas to the training and go against what Keller thought up, she was not respected, attacked, threatened, and put in horrible positions for it because, on information and belief, her outside ideas were a threat to Keller's dictatorship over KWRI. On information and belief, Keller wanted to destroy anyone that went against his thinking in any capacity. The people of MAPS are good people who work hard, however, the problem with MAPS now lies with its leadership, specifically Gary Keller's.

increase his own bottom line and drive independently owned and operated Market Center profits down even further. Nowhere in any franchise agreement does it disclose or authorize any portion of any fees paid by a Market Center to be used merely to create additional wealth for Keller.

228.    Defendants' practices of knowingly overcharging franchisees and requiring franchisees to only purchase from Keller-owned companies are directly contrary to KWRI's licensing agreements which provide, for example, that "Franchisee and each Franchisee's Principal specifically acknowledge that such training, trade secrets and confidential information is provided by Company *for the benefit of the System, and each Market Center, and that the System and each Market Center individually and mutually benefits from all franchises complying with the covenants described below.*" (Emphasis added).

229.    These practices described herein are also contradictory to KWRI's own motto, "where entrepreneurs thrive," as there is little to no opportunity, given Gary Keller's control and operation as a de-facto broker instead of a franchisor, for an owner to make economic decisions for their benefit.

230.    KWRI and its affiliates, including Team and Keller-owned businesses, have received substantial revenues from KWRI's systematic and fraudulent control and overcharging on direct sales to franchisees. For example, on technology fees alone, KWRI's increase of the fee from $25 per month per agent to $65 per month per agent resulted in a $600 million per year profit for KWRI, and the increase alone resulted in a $80.6 million per year increase, which, on information and belief, all was pocketed by Gary Keller.

231.    Additionally, MAPS coaching alone generates approximately $53 million per year in profit for KWRI. Keller owns multiple other companies from which franchisees are required to purchase, including behavioral profiles, Keller-written books, and other products, including the

now defunct KWEN, which directly took Company Dollar from Market Centers and funneled it to KWRI and Gary Keller.

232.     In the KWEN product, Royalty was not enough for Gary Keller. He wanted some of the Market Center's Company Dollar as well.

233.     As a result, KWRI makes hundreds of millions of dollars in profit from the products and services that it forces franchisees to buy *alone*.

## VIII.   DEFENDANTS IMPROPERLY SET MARKET CENTER CAPS AND DEVALUE MARKET CENTERS

234.     Upon Davis's departure in January 2019, Keller had free reign to implement his deceptive, narcissistic strategies as he pleased, because, as he had stated before, "because we're private, we're not under a microscope. We can do what we want, any way we want with no penalty."

235.     Immediately after Davis resigned, Gary Keller revamped the KWRI leadership strategy, which, under Davis, focused on empowering each individually owned and operated franchise Market Center to increase profitability, to instead take away all control that investors had in their Market Center and regional franchises.

236.     Notably, in directing that Market Center caps be reduced, Keller *did not reduce the Royalty owed to KWRI*. Therefore, each Market Center had to absorb the full loss of income from the lowered caps, and KWRI and Gary Keller's revenue stayed the same, if not increased. In simplest terms: KWRI and Keller's money went up, and franchisees' money went down.

237.     While this was presented as a "recommendation," presumably to avoid the inevitable legal implications of overtly overstepping his role as a franchisor and instead becoming a de-facto broker, this was far from a recommendation. When dealing with KWRI, like a criminal enterprise, when the "boss" "recommends" a tactic, all better follow suit or face unpleasant

consequences.

238.     Indeed, any step outside of Keller's "recommendations," even those not disclosed in the franchise agreements, would result in punishment.[16]

239.     Additionally, there were numerous Market Center owners who initially resisted this decrease in Market Center cap. However, these Market Center owners were not given a choice— the only option was to lower caps or be removed from the KWRI system. In this instance, the Market Center owner's investment is taken away, and the franchise is basically stolen out from under them.

240.     Indeed, one Market Center owner, Colleen Basinski (and, on information and belief, hundreds of others), was ordered by the Regional Director[17] to immediately lower Market Center caps or face consequences that included the non-renewal of licensing.[18]

241.     Moreover, adding to the pressure KWRI and Keller were already putting on Market Centers to reduce caps, Keller informed all top agents of the directive to Market Centers to reduce caps, and therefore, if a Market Center did not lower its caps, those agents and any agents that they told could potentially move to a competing Market Center that followed directives to lower caps. In other words, Keller, as KWRI's new CEO, lit a fuse for a civil war amongst Market Centers.

242.     If a Market Center owner refused to lower their caps, Keller, in his own words set out to make that owner "destitute," and, directly and indirectly in violation of the franchise agreements, would solicit top producing agents from that Market Center to move to a complying

---

[16] For example, after Davis resigned and disagreed with Keller's recommended cap change, without consulting Davis, Defendant Team sent a false email to the investors of the Canada region, which Davis held ownership interest in, stating that Davis would no longer be serving as the Operating Partner of the region. However, Davis had not been removed, and Team's reasons were entirely made up.

[17] Regional Directors are part of the Region and are representatives of KWRI.

[18] See *Basinski v. KWRI, et al.*, case no. D-1-GN-23-001314.

Market Center that had lowered its caps.

243.    Also, notably, even though Market Center caps were slashed, *KWRI's Royalty fees stayed the same.*

244.    This scheme, according to Keller's directive, entirely devalued individual franchisee profits, while increasing Keller's buying power. Additionally, Gary Keller and KWRI's representations that induced Market Centers to lower caps were deceptive and false, and only driven by greed. By way of example, and not limitation:

a.    Gary Keller justified the reduction in Market Center caps by stating to owners that reducing caps would drastically increase agent count, as it would have to in order for Market Center owners to break even. When Keller made that representation, he knew agent counts at all Market Centers would not double or drastically increase. In 2018 (January-June), Davis's last year at KWRI as CEO, however, the total agent count at KWRI was 167,254. In 2023 (January-June), after Keller had gone on a four-year personal campaign to lower caps as the CEO and de-facto CEO, the agent count was 169,243. A mere 1% increase in agent count. Net effect: the reduction of the cap had no impact on agent count. Without more agents, individually owned and operated Market Centers inevitably saw their profits disappear.

b.    KWRI is aware that Profit Share is dropping and represents a profit crisis within KWRI. However, this is not because some agents have transitioned to other real estate companies, as KWRI suggests. The Profit Share crisis exists simply because there is less overall profit to share, due to Keller's insistence on Market Centers lowering caps. Gary Keller is attempting to sell people on the idea that the Profit Share system was "broken" while ignoring what is actually causing the issue.

c.    On information and belief, Keller was also upset that the eXp founder did not give back his Profit Share when he left KWRI. Moreover, some of the recently changed internal Profit Share processes and procedures within KWRI include restructuring of the Profit Share program. However, this is futile as more profit is not being created. Instead, KWRI is simply moving money around to create the appearance of profit.

d.    In 2018 (January-June), Davis's last year at KWRI as CEO and before reducing the caps when Market Centers were respected as individually owned and operated businesses, Market Center Owner Profit was in total $105,750,354. In 2023 (January-June), once again after Keller's four-year personal campaign in which he used the forces of his company, Owner Profit was $54,159,041. This is roughly a 50% decrease in Market Center owner profit. The cap does matter for individually owned and operated businesses—it was not Defendant Keller's money to interfere

with. Owner profit per individual Market Center also decreased by roughly 50%. In 2018 (January-June), average owner profit per Market Center was $131,367. In 2023 (January-June), it was $65,886.

e.   Notably, Market Centers lost nearly half of their profit under Keller's directive. Despite the drastic reduction in owner profit, KWRI's Royalty increased. Indeed, in 2018 (January-June), KWRI Royalties totaled $105,263,219. In 2023 (January-June), KWRI Royalties increased to $108,633,410. In 2018 (January-June), KWRI Royalties were $105,263,219, and Owner Profit was $105,750,354. When KWRI, collectively, focused on the franchisee with Davis's partnership, the franchisee actually made more money than the franchisor. This was a win- win. Today, in 2023 (January-June), Royalty is $108,633,410 and Owner Profit is $54,159,041. The cap clearly does matter. Focusing on growing franchisees' businesses does matter.

245.   While franchisee profits were cut nearly in half, KWRI and Gary Keller saw their profits and Royalties increase. Gary Keller and KWRI knew this would happen when they made representations to Market Centers stating otherwise. The net effect of this Keller-mandated, deceptive, fraudulent scheme was that *Gary Keller's purchasing power against the Market Centers and the Regions increased by approximately 60%.* Gary Keller and KWRI misled Market Centers to unknowingly cause their own demise.

246.   In essence, Gary Keller was and is willing to hurt his own people in order to increase his profits—Keller drove profitability down so that he could recapture the individual franchises and own the real estate monopoly by himself and with his allies.

## IX.   DEFENDANTS INTERFERE WITH THE SALE OF REGIONAL AND MARKET CENTERS AND DEMAND THAT THEY BE SOLD BACK TO KELLER AND HIS AFFILIATES BELOW MARKET VALUE

### A. Davis's Regions

247.   When Davis resigned as KWRI CEO in January 2019, he had partial ownership in several regional entities, including the Republic of Colorado, Ltd., KW Mid-American Region, Ltd., Region Investco, Ltd., and Anacacho BE, Ltd., Greater Heartland, Southern California, Canada, and Manhattan.

248.     Upon his resignation, and to have a clean break with the KWRI franchise system entirely, Davis set out to sell his ownership interest in the Regions.

249.     Davis had deals set with a third-party, Smokey Garrett, to purchase his ownership interests in the majority of the Regions at fair market value. Gary Keller's actions interfered with both Davis's and Garrett's livelihood.

250.     Garrett was more than qualified as a buyer. Indeed, he was the number one Market Center operator in terms of profit in the system at that time, he was a successful Regional Director he was a Hall of Fame Team Leader, he operated multiple Market Centers at a very high level, he was a driving force behind Keller Mortgage's sporadic successes. Garrett was an excellent teacher as well, and has always been asked by KWRI to teach classes and lead meetings. Despite these clear qualifications, however, Gary Keller refused to let Davis sell his interest to Garrett. Instead, Keller used Garrett to get Davis down on price. Then Gary Keller knocked Garrett out of the deal, so that Keller and his associates could benefit. Defendant Gary Keller took what he wanted, consistent with his playbook.

251.     On information and belief, Gary Keller refused to allow Garrett to purchase all of Davis's Regions due to Garrett's failure to support Keller's cap reduction scheme.

252.     Indeed, Gary Keller, on information and belief, had a playbook of criminal-like behavior to devalue businesses, as demonstrated above, and then re-purchase the business back for himself or for his associates.

253.     Gary Keller's playbook, the "why buy what you can steal" campaign, is clearly evident in Plaintiff Davis's selling of his equity in the Manhattan and Canada Regions upon his resignation from KWRI.

254.     Indeed in 2019, when Davis was about to sell his interest in the Manhattan region,

Keller ultimately forced a Market Center within the region to close, and forced another Market Center into default before the sale in order to devalue the region. Keller then told Davis that if he wanted to sell the region, he *must* sell to his associate, Bryan Fair.

255.    Gary Keller even gave Fair terms of the sale without consulting Plaintiff. Keller also behind the scenes coached Fair to "blow up" the sale if the terms were not met.

256.    Davis, faced with a region that was losing money by the day due to Keller's actions and a strong desire to be done with the KWRI system entirely, had no choice but to sell to who Keller demanded.

257.    As a result, Davis received $500,000 from Fair for the Manhattan Region, a price much lower than it originally was worth before Keller forced Market Centers within the region to close.

258.    Worse, because Gary Keller forced Market Centers within the Region into default, upon receiving the $500,000, Plaintiff had to pay $750,000 to the owners of the Market Centers in order to get them out of default. Beyond that, Plaintiff was forced to pay $225,000 to Keller's associates because, at Keller's coaching, they threatened to "blow the deal up," as well as threatened litigation, if they were not paid.

259.    Davis paid these individuals at their demand for the sake of being done with the KWRI system. As a result, the sale of the Manhattan Region, due to Keller's actions, Davis not only did not make money on his equity, it cost him approximately $1,000,000 to get out of business with Keller Williams.

260.    Similarly, with regards to the Canada Region, which Davis in partnering with the Canadian leadership (as he did in the United States), transformed an underperforming Region to one of the top performing Regions in the system, Keller told Davis who he had to sell to and

determined how Davis's equity would be split.

261.    When Davis became the Regional Operating Partner of Canada, there were numerous problems across individual Market Centers in the Region due to KWRI's technology. Indeed, the transmittal process in Canada was so cumbersome, it required additional software and steps than that of the US. Further, the app did not work.

262.    When Davis, as Regional Operating Partner of the Canada Region, brought these concerns back to KWRI, he was instructed to set up a Canadian Task Force to remedy these issues. Davis served as the Head of Growth of this Task Force, along with a technology driver, Tami Blakeny, a product driver, Tamara Hurwitz, and a MAPS representative, Dianna Kokoszka.

263.    The Task Force also hired a technologist, Gilles Plourde. With the help of this Task Force, the Canada Region took off and became one of the top Regions in growth.

264.    When Davis went to sell his equity in the Canada Region after his resignation, however, and when Keller deemed the price too high (though it was a price Keller agreed to), Team, working at the direction of Keller, stepped in and destroyed the deal for the sale of the Canada region.

265.    Davis, thinking that he still had some freewill over the sale of his equity, found a qualified, established, third-party buyer that was willing to pay fair market price for the Region.

266.    In response to Davis's potential sale, Keller and Team instructed KWRI to stop funding the Task Force technologist's salary, and to cease providing translation support to the Canada Region, which hurt the agents and the Market Centers in that Region, was essential to the functioning of that Region, and was illegal, as it is the law for Canadian entities to operate with two languages.

267.    Further, Team and Keller ceased honoring financial commitments to the Canada

Region, thereby jeopardizing the Region's good standing both legally and financially.

268.   Team and Keller did this, on information and belief, all because they wanted to saddle the Canada Region with exorbitant everyday expenses to set up their own translation tools in order to avoid legal consequences resulting from the noncompliance that KWRI had caused, and to drive the price of the Canada region down so that Keller and his associates could purchase the Region.

269.   Gary Keller and Team then told Davis that he was not permitted to sell the Region to a qualified third-party buyer, and if he wanted to sell, he had to sell to a *hand-picked affiliate of Keller*, named William Soteroff.

270.   On information and belief, Gary Keller, Josh Team, and William Soteroff worked together and conspired to drive down the selling price of Davis's Region.

271.   When Soteroff entered the deal, Davis, realizing that if he held onto the Region longer, the price would only be driven down further, was forced to sell the Region for nearly $1,000,000 less than what it was worth.

272.   Indeed, in Keller's own threatening words to Davis, "I believe every day that this region is without new ownership the value deteriorates…if a change…doesn't [happen] pretty soon I have no idea what will exist and what it will be worth."

273.   Gary Keller intentionally created chaos according to his own playbook to get exactly what he wanted. As a result, Davis's ownership interests, and those of hundreds of others, have been devalued by Gary Keller and Team for the purpose of recapturing the entity at a deflated price.

274.   Defendant Gary Keller and his co-defendants engage in an illicit practice of creating issues with regions and regional owners they seek to upend, terminate and take. Keller's

co- defendants are repeatedly instructed to "blow up deals" and create situations where regional owners are unable to sell their holdings to qualified buyers and are forced instead to sell their holdings to Keller allies at deflated prices.

275.     Upon information and belief, Defendant Gary Keller and his co-defendants have placed the holdings of more than one current Region under threat of default and/or actively sought to take the holdings of others. This activity is often cloaked from the public and those within Keller Williams through arbitration proceedings that shield defendant Keller's illicit schemes from other unwitting market centers and region owners.

### B.   Herfel's Market Center

276.     As of June 2019, Herfel purchased additional shares of his Arizona Market Center and owned a total of 59.35% of the Market Center.

277.     After being fired from his Regional Director role in 2020, the new Regional Directors began working with the Market Center Team Leaders, requiring daily and weekly reporting calls.

278.     This top-down leadership was new to the Regional-Market Center relationship, and looked more like an employer-employee relationship, rather than a franchisor-franchisee relationship.

279.     Indeed, on more than one occasion, Jonathan Dupree, who Green stated was Gary Keller's "hand-picked" person to replace Herfel as Regional Director, threatened all of the Market Center Team Leaders' jobs if they did not abide by his directives and mandates.

280.     In addition, Dupree and Gary Keller perpetuated the notion that agents and Market Center owners are KWRI employees, rather than independent franchisees, as anytime an agent would leave Herfel's Market Center (or any Market Center), Dupree would call Herfel in a fit of

rage that he was not included in the conversations with the agent.

281.    Prior to reducing caps in 2020, Herfel's Market Center was a top growth Market Center in the Southwest Region.

282.    Indeed, in March 2020 alone (the month before the cap reduction took effect), Herfel's Market Center brought in 37 new agents.

283.    Once the cap reduction occurred, however, Herfel's owner profit plummeted while KWRI expenses skyrocketed.

284.    Herfel attempted to hold onto his Market Center, however, the financial ruin resulting from the cap reduction forced him to announce that his Market Center was up for sale in October of 2022.

285.    Due to the dire financial situation of KWRI, Herfel found it nearly impossible to procure a buyer for his Market Center. However, he knew that he needed to effectuate a sale.

286.    At the time, Gary Keller was the owner of the Southwest Region, Matt Green was the Regional Operating Partner, Jonathan Dupree was the Regional Director, and Marc King and Jason Abrams were investors in the Region.

287.    On information and belief, Gary Keller, Green, Dupree, King, and Abrams worked together to strongarm the sale of Herfel's Market Center at a criminally low price.

288.    Matt Green reached out to Herfel and informed him that he should speak to Cody Gibson regarding the sale, who, conveniently, was another of Gary Keller's right-hand men.

289.    Despite the sale of Herfel's Market Center taking months up until this point, once Gibson entered the conversation at Gary Keller and Green's direction, the sale was rushed along.

290.    Herfel was then forced to sell his Market Center at 50% of his asking price due to his inability to go to the open market to find a buyer, as the buyer had to be approved by Gary

Keller and Green.

291.     Worse, Gary Keller mandated that Herfel personally carry the note for the sale, which he still carries to date.

292.     At the time, however, due to the stress and utter lack of leadership, Herfel made the decision to get out of KWRI as quickly as possible, knowing that his investment would only lose more value by the day.

293.     Herfel, therefore, is an example of one of hundreds of Market Center owners that have worked their entire lives to create a profitable business that could fund their retirements, only for it to be nearly worthless in the end due to the cap reductions and exorbitant fees mandated by Gary Keller and his associates at KWRI.

294.     As a result of the conduct referred to above, Plaintiffs and many other franchisees have lost hundreds of millions of dollars in their investments due to KWRI and Keller's intentional, egregious, deceptive, and greedy practices.

**X.     <u>Gary Keller's Diversion and Improper Allocation of Funds</u>**

295.     On information and belief, Gary Keller has operated under a practice and pattern of improperly using fees collected from franchisees for purposes outside the accepted and defined use of the fees, for both personal gain and to fund additional Keller-owned entities.

296.     Under this scheme, Keller has been able to: (i) divert funds to his own pocket; and (ii) create and fund additional businesses which Keller can then force franchisees to buy into.

297.     This cyclical pattern results in a snowball effect for franchisees, where their money is put towards other companies, which will in turn cost them even more in order to remain in "compliance" at KWRI.

298.     On information and belief, the funds diverted directly to Gary Keller for personal

use are also diverted to his son, John Keller.

299.     Gary Kellers diversion and improper allocation of funds raises a conflict of interest which results in Gary Keller and his associates continuously placing their interests above those of the franchisees, driving franchisees to near bankruptcy while enriching their own pockets.

### A. Technology Fees

300.     On information and belief, in addition to charging exorbitant fees to franchisees and driving down Market Center profits, Gary Keller has also diverted these funds for his own personal gain, in an attempt to misrepresent and underreport KWRI and his personal profits.

301.     As stated above, Gary Keller continues to mandate that technology fees be increased, however there has been no improvement or functionality in KWRI technology whatsoever over the years.

302.     Indeed, the KWRI technology is such a fail that Gary Keller's own personal team of agents, operating under the company name Livian, uses a technology called "Follow Up Boss." Interestingly, Follow Up Boss is not owned or created by Keller.

303.     In October 2023, Follow Up Boss was purchased by Zillow.

304.     In other words, while KWRI Market Center owners are suffering through a profit crisis, Gary Keller is driving a conspiracy to force agents to pay more and more for his technology, all while the real estate team that he has purchased uses an outside technology vendor that actually works.

305.     On information and belief, in order to make his own team of agents more productive and profitable, Gary Keller has purchased an outside technology to implement for Livian, while forcing agents and Market Centers to pay for his "technology" at KWRI, which in reality, goes personally to Gary Keller.

306.     Gary Keller's "technology" at KWRI continues to be an expensive con, even after Defendant Team left KWRI.

### B. 72Sold

307.     Yet another entity owned by Gary Keller for which Market Centers are required to pay is a "leads company" called 72Sold.

308.     72Sold touts itself as leads and marketing platform which can allow agents to sell a home in just 72 hours. The company claims that the shortened availability on the market cause the property's value to increase.

309.     In reality, 72Sold is basically a brand that does misleading national advertising, stands in front of agents, and sells leads to agents.

310.     72Sold runs ads nationally claiming, among other things, that: (i) the company has thousands of favorable reviews; (ii) five independent studies show that home sellers make 8.4 - 12% more than other homes in their local MLS; (iii) the company can sell a home within eight days; (iv) sellers can get a quick quote from their website; (v) the company has been featured in Forbes, ABC, NBC, and CBS news; (vi) the company has won an ACE innovator of the year award; and (vii) 72Sold is a different approach than traditional real estate.

311.     Despite these claims, the non-profit Truth in Advertising has shown many of these claims to be misleading.

312.     For example, they discovered that many of the reviews were from agents participating in the program, not clients. As a result of their discovery, the Better Business Bureau has taken down 72Sold's page for now. An agent who participated in training for the program said that she was encouraged throughout the training to post reviews and that it would help her make more     money     if     she     did.     *See*     72Sold     exposed,     available     at

https://www.youtube.com/watch?v=G8bML_q_UaY.

313.     Further, the founder of 72Sold has stated in an interview that he learned that agents have success marketing a program, not themselves, and as a result, 72Sold rests on the marketing of the program and putting the program in front of the agents. This notion goes directly against what Gary Keller has preached for 40 years—that Keller Williams stands behind the agents' brand, not national brand advertising, as, in Gary Keller's words, people choose real estate agents not based on brands, but based on who they know and trust.

314.     Importantly, however, Gary Keller is in a joint venture with 72Sold, and owns 49% of the company.

315.     Additionally, Gary Keller obtains more control of the company *based on how many agents he gets to sign up.*

316.     Indeed, Gary Keller has made this a mandate within Regions, giving Regions a *quota* for how many people must sign up for 72Sold.

317.     Moreover, Gary Keller has devoted at least three Regional Director meetings to 72Sold.

318.     In other words, Gary Keller does not even respect his own values and beliefs within the company—if he can make money off of the company, it doesn't matter what he has stood on for years.

319.     After personally telling agents that 72Sold is the "secret" to successful real estate, Gary Keller is personally collecting money in three ways from agents: (i) the 72Sold training and marketing materials are available to agents at an initial cost of $199 and then $72 per month; (ii) agents pay $1500 per month for 4-6 leads from the marketing, and this can increase incrementally (for example, agents can pay $3000 per month for 8-12 leads, and so on); and (iii) if agents sell

one of those leads, they pat 25% of their commission for the "referral."

320.    Worse, on information and belief, Keller has used the fees obtained from franchisees, including technology fees, to fund the joint venture with 72Sold and charge agents and Market Centers even more to be able to function, all while directly profiting Gary Keller.

### C. Livian

321.    In 2021, Gary Keller purchased the real estate team "Livian," which is touted as a "people-first real estate platform."

322.    As of 2021, Livian had "33 real estate teams in 21 states, powered by 270 real estate agents and 40 employees nationwide." *See* Real Estate Platform 'Livian' Launches in Partnership with Keller Williams, available at https://headquarters.kw.com/press/real-estate-platform-livian-launches-in-partnership-with-keller-williams/.

323.    Despite Keller Williams representing that it was launching in "partnership" with Livian, the company was purchase by Gary Keller himself, through KWx, the holding company which he owns and for which he acts as executive chairman.

324.    Further, on information and belief, Gary Keller has improperly allocated funds collected from franchisees to purchase and fund Livian, which operates in competition to KWRI Market Centers.

325.    Indeed, Gary Keller, through his intrusive control of KWRI franchisees, as well as his control of the real estate team Livian, has been able to create a monopoly of the real estate industry and pit Livian against his very own franchisees in order to drive up and extract additional fees from his KWRI franchisees.

### D. KWx

326.    In addition to the above companies, on information and belief, Gary Keller has

been misappropriating funds through his new holding company KWx.

327.    KWx was created in 2020, after the Defendants' fraudulent scheme was set in

place.   *See*   Keller   Williams   Forms   New   Holding   Company,   available   at

https://headquarters.kw.com/press/keller-williams-forms-new-holding-company/.

328.    While Gary Keller has painted KWx as a "reorganization" of Keller Williams, on

information and belied, KWx is an extension of Gary Keller's personal entities, and allows him to

divert KWRI and franchisee funds for his personal use.

329.    Indeed, Gary Keller is the creator of KWx and acts as "executive chairman" for

KWx.

330.    Additionally, KWx is the same holding company which Gary Keller used to

purchase and fund Livian.

331.    On information and belief, Gary Keller has diverted numerous funds through

KWx and has funded multiple, if not hundreds of other entities and properties in his personal

portfolio   as   well   as   Keller   Capital   portfolio.   *See*   Keller   Capital,   available   at

https://www.kellercap.com/venture-and-equity-investments/.

332.    On information and belief, while falsely representing that fees are collected from

franchisees for certain purposes, such as advancements in technology, Gary Keller uses these fees

to fund other personal ventures that he can use for his personal gain.

### AS AND FOR A FIRST CAUSE OF ACTION
**Civil RICO in Violation of 18 U.S.C § 1962(c)**
**(on behalf of all Plaintiffs against Defendants Gary Keller, John Keller, Josh Team, MAPS, 72Sold, Jonathan Dupree, Marc King, Jason Abrams, Matt Green, William Soteroff, Kwx, Livian, and KW Southwest Region)**

333.    Plaintiffs repeat and reallege each and every allegation above as though fully set

forth herein.

334.     18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

335.     18 U.S.C. § 1964 provides for civil remedies for violations of 18 U.S.C. § 1962.

336.     18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate" § 1962(c), along with other provisions.

337.     18 U.S.C. § 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." An "association-in-fact" enterprise can be established by demonstrating "(1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose." *United States v. Hinojosa*, 463 F. App'x 432, 449 (5th Cir. 2012).

338.     Defendants Gary Keller, John Keller, Team, MAPS, 72Sold, Dupree, King, Abrams, Green, Soteroff, KWx, and Livian have violated 18 U.S.C § 1962(c) because they have conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.

339.     The KWRI franchise system, which is comprised of, among others, Defendants Gary Keller, John Keller, Team, MAPS, 72Sold, Dupree, King, Abrams, Green, Soteroff, KWx, and Livian, and its affiliates and/or subsidiaries that sell products, services and materials to KWRI franchisees, is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) by virtue of their agency relationships with each other in the area of the KWRI franchise system.

340.    Gary Keller, as the founder and operator of KWRI, and the mastermind of the scheme, served as one member of the enterprise as well as provided the structure of the enterprise, with John Keller, Team, MAPS, 72Sold, Dupree, King, Abrams, Green, Soteroff, KWx, and Livian, as KWRI employees and affiliates, serving as the other members of the enterprise.

341.    This enterprise is separate and distinct from the individual defendants that participate in its direct affairs because the structure of the enterprise is imposed by, among other things, the terms of the franchise and licensing agreements upon which defendants have relied upon in requiring Plaintiffs and other franchisees to take and/or refrain from taking certain actions throughout the course of dealings within the KWRI franchise system.

342.    The enterprise served to protect KWRI's and the individual defendants' interests, including institutional and financial interests, at the expense of KWRI franchisees such as and including Plaintiffs.

343.    Defendants conduct the affairs of the association-in-fact enterprise, as opposed to merely their own affairs, by, among other things, enforcing the provisions of the agreements to require Plaintiffs and other franchisees to take and/or refrain from taking certain actions throughout the course of dealings within the KWRI franchise system, by asserting control over the activities of Plaintiffs and other franchisees in a hierarchical manner.

344.    Defendant Keller participated in the conduct of the enterprise through the exercise of his control, as founder of KWRI, over the franchisees' purchase of products, services, and materials which were supplied by companies that were founded and maintained by Keller, separate and apart from KWRI or else be subjected to removal from their position as owner and/or operator of the Market Center or regional franchise. These purchase requirements were never explicitly set forth in the franchise agreements.

345.    Further, Keller himself was the "mastermind" behind the scheme to have Market Centers lower their caps, as demonstrated through various emails and conversations that Keller engaged in dating back to 2018. This scheme caused both Market Centers and Regions to lose their value so that Keller and his affiliates could repurchase, and maintain control over, KWRI franchises throughout the country.

346.    Keller himself inserted himself in the resale of franchises, such as Plaintiff's regional franchises, refusing to allow Plaintiff to sell to qualified, independent parties at fair market value, and instead demand that in order to be permitted to sell the Regions, they must be sold to Keller and/or his affiliates at a price much lower than market value.

347.    Further, Gary Keller required franchisees to pay increasing "technology fees," which, on information and belief, were not put towards producing new technology as stated in the agreements. Defendants further gained control over the franchisees by "recommending," but in reality, requiring, franchisees to lower their Market Center caps, thereby devaluing the Market Center, while maintaining or increasing KWRI bottom line, and therefore placing Plaintiff and other franchisees in submissive positions with regard to re-selling their franchises. Indeed, this put KWRI and its associates in positions of control to re-purchase and maintain control over its franchise branches, as franchisees sought to sell their businesses in the face of losing their only cash flow and facing imminent bankruptcy.

348.    Worse, Gary Keller then exerted control over the sale of these businesses, requiring that they be sold to members of the enterprise and its associates, at a deflated price, much lower than true market value, and lower than the sale price which franchisees could have sold their business for in arm's length transactions to truly independent buyers.

349.    Indeed, the Defendants engage members of the enterprise or affiliated third parties

in the resale of KWRI franchises across the country, including Market Centers and regional franchises, at sales prices significantly below the original investment of the franchisee, thereby devaluing the overall market value of a KWRI franchise and making it difficult if not impossible for any franchisees to recoup their investment.

350. Defendant Team participated in the conduct of the enterprise through scheming to create a "technology plan," to effectuate a higher evaluation for KWRI, whereby inflated technology fees were collected from Market Centers every month, however, KWRI produced no new technology to benefit the franchisees. Further, to the extent that rights to enforce and apply the franchise agreements have been delegated to Team, Team has participated in the conduct of the enterprise through the exercise of his control, over the franchisees' purchase of products, services, and materials.

351. Defendant MAPS and its affiliates and subsidiaries has participated in the conduct of the enterprise by its provision of products and services to the franchisees.

352. Defendant 72Sold and its affiliates and subsidiaries has participated in the conduct of the enterprise by its provision of products and services to the franchisees.

353. Defendant Kwx and its affiliates and subsidiaries has participated in the conduct of the enterprise by serving as a means for Gary Keller to divert fees and fund additional Keller-owned company through which he can extract extra fees from franchisees.

354. Defendant Livian and its affiliates and subsidiaries has participated in the conduct of the enterprise by its provision of products and services to the franchisees.

355. Defendant John Keller participated in the conduct by now serving as CEO of KWRI, and exerting control over the scheme set in place by Gary Keller. On information and belief, John Keller has stepped into the CEO role in an attempt to mitigate liability for Gary Keller

and hide funds.

356.     Defendant Jonathan Dupree participated in the conduct by serving as a leader in the Southwest Region and conspiring with the other Region leadership to have Defendant Herfel removed from his leadership position when he refused to agree with Gary Keller's scheme, and then to strongarm the sale of Herfel's Market Center at a price much below market value.

357.     Defendant Marc King participated in the conduct by serving as a leader in the Southwest Region and conspiring with the other Region leadership to have Defendant Herfel removed from his leadership position when he refused to agree with Gary Keller's scheme, and then to strongarm the sale of Herfel's Market Center at a price much below market value.

358.     Defendant Jason Abrams participated in the conduct by serving as a leader in the Southwest Region and conspiring with the other Region leadership to have Defendant Herfel removed from his leadership position when he refused to agree with Gary Keller's scheme, and then to strongarm the sale of Herfel's Market Center at a price much below market value.

359.     Defendant Matt Green participated in the conduct by serving as a leader in the Southwest Region and conspiring with the other Region leadership to have Defendant Herfel removed from his leadership position when he refused to agree with Gary Keller's scheme, and then to strongarm the sale of Herfel's Market Center at a price much below market value. Defendant Green further participated in the conduct by creating a spreadsheet to justify Gary Keller's directives to lower Market Center caps.

360.     Defendant William Soteroff participated in the conduct of the enterprise by conspiring with Gary Keller and Josh Team to purchase Davis's Canada Region at a price much below market value.

361.     The predicate crimes committed by Defendants are wire fraud as set forth in 18

U.S.C. § 1343 and extortion.

362.    Violations of 18 U.S.C. § 1343 are "racketeering" activities as defined in 18 U.S.C. § 1961(1).

363.    The enterprise created a financial benefit to each of the defendants.

364.    In violation of 18 U.S.C. § 1343, Defendants created and effectuated a scheme to defraud Plaintiff and other franchisees, which consisted of deliberately and knowingly causing franchisees to be subjected to exorbitant and burdensome fees in the form of products, services, and materials produced by KWRI, Keller, MAPS and their affiliates, which were not disclosed as requirements in the franchise agreements, and which, if refused, would result in punishment in the form of removal from the franchisees position, ownership, and control over the franchise.

365.    The execution of the scheme to defraud created by Defendants involved numerous individual instances of the use of interstate wire facilities in furtherance of the scheme, which uses of interstate facilities were reasonably foreseeable by Defendants.

366.    The conduct alleged constitutes a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5) as Plaintiffs were subject to more than two events of trafficking and exploitation in violation of 18 U.S.C. § 1343.

367.    Specific instances of the uses of interstate wire facilities in furtherance of Defendants' scheme include, but are not limited to: (i) payments made by franchisees for the aforementioned required products, services, and materials, which were wired from individual franchisees to the KWRI headquarters; (ii) franchisees collected the Market Center caps and royalties from Market Center agents, and directly wired the royalties to KWRI headquarters, who then wired part of the royalties to the Regions; and (iii) payments for purchases of franchises at deflated prices were made via wire transfer. Such transfers are ongoing to date.

368.     The acts of wire fraud as alleged herein are related because they involve repeated instances of using interstate wire facilities to defraud the franchisees of money each time a fraudulently required and inflated price is charged to franchisees and received directly by KWRI or in the form of a kickback from other Keller-owned companies, as well as each time a franchise is captured and repurchased by Keller and his affiliates at a deflated price. In addition, all of the KWRI franchises across the country have been victimized by the enterprise's fraudulent scheme, meaning that the scheme has thousands of victims, at minimum.

369.     Similarly, acts of extortion are "racketeering" activities as defined in 18 U.S.C. § 1961(1).

370.     Specific instances of Defendants' extortion include, but are not limited to: (i) Gary Keller's statement that anyone who did not support his cap directives "did not need to be in leadership positions" at KWRI; (ii) Gary Keller's follow through of this statement, having those that opposed his scheme, such as Plaintiffs, removed from leadership positions at KWRI; (iii) Gary Keller's threats to Plaintiff Davis that every day he refused to sell his Region back to Keller, the Region would lose even more value; and (iv) Gary Keller's and Defendants' outward steps to devalue entities, such as the Canada Region, prior to the sale transaction so as to secure a lower price. Such active threats and acts of extortion are ongoing to date.

371.     Plaintiffs have been damaged by reason of the Defendants conducting the affairs of the KWRI franchise system though the pattern of racketeering activity as alleged herein, and more specifically have been damaged by the predicate acts of wire fraud that result in payments being debited by electronic transfer from their bank accounts, as well as damages resulting from Defendants' extortion, in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c).

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of § 1 of the Sherman Act (Against Defendants KWRI, Gary Keller, John Keller, MAPS, 72Sold, KWx, and Livian)

372.     Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

373.     There exists a market for ownership in the real estate market franchise, in which KWRI maintains substantial market power. KWRI maintains over 1,100 Market Center offices and approximately 191,000 real estate agents across the United States. KWRI is touted as the largest real estate franchise by agent count in the world.

374.     A separate market exists for related goods and services, including training materials and mortgage providers, associated with the operations of a real estate franchise.

375.     KWRI affiliates, including entities in which it maintains a financial or other ownership interest, as approved vendors of such goods and services from which it receives direct compensation or kickbacks to KWRI or other affiliated entities through Keller's ownership of the related providers.

376.     KWRI conceals the nature of the mandatory purchasing of other Keller-created goods and services from potential franchisees including Plaintiff, in order to lock them into onerous franchise agreements and create excessive control and cost switching.

377.     At all times KWRI and its affiliates had monopoly power, market power and/or economic power in the relevant real estate franchise market, sufficient to force franchisees to purchase and accept the required goods and services from KWRI affiliated companies.

378.     KWRI manipulated its economic power in the real estate franchise market to coerce franchisees to purchase products, services, and good solely from Keller-owned companies, such as MAPS and other affiliated companies in which Keller maintains a financial interest.

379.     Moreover, Keller refused to allow fair sale of Market Center and Regions, and instead demanded that sales be made to himself and his affiliates at a price much lower than fair market value—this is Keller's playbook: "why buy what you can steal." Keller's playbook is done to enrich himself and his associates at the expense of other hard-working, independent owners within the KWRI system.

380.     Through the exercise of KWRI's economic power as alleged herein, KWRI has conditioned the purchase of KWRI franchisees upon the purchasing of goods and services provided by Keller-owned companies from which Defendants receive a kickback, or else be removed as owner and/or operator of the franchise.

381.     Moreover, KWRI has overstepped the legal and ethical bounds of a franchisor and instead has acted as a sole purpose de facto broker, controlling the market, given the sheer size of KWRI.

382.     Additionally, Gary Keller has created a monopoly of the industry by purchasing a Levian, a real estate team to directly compete with his Market Centers. By gaining control of Levian, Gary Keller obtained even more leverage to steal agents from Market Centers and devalue the Market Centers for his personal gain.

383.     As a direct and proximate result of Defendants' anti-competitive tying activity, Plaintiff and other franchisees have been injured by being forced to pay inflated prices for goods and services, and have not been allowed to purchase similar goods and services via third-party independent transaction. Further, as a result, Market Centers have been forced to pay much of their expected profit to KWRI in the form of fees, thereby devaluing the Market Center and the Region as a whole.

384.     A substantial amount of interstate commerce in goods and services, including

training, is needed to operate a KWRI franchise. KWRI's practices impose an unreasonable negative effect on competition in the marketplace, because KWRI's policies of coercing and conditioning the purchase and operation of a franchise on the purchase by franchisees of good and services provided by Keller-owned companies, such as MAPS and other Keller-owned entities. This practice forecloses the ability of vendors which are not Keller-owned and operated from selling their products and services to franchisees, even though the quality of such goods and services is equal to, if not better than, the quality of what is being provided by Keller-owned companies.

385.    KWRI's tie of its franchises to products and services from Keller-owned suppliers imposes an unreasonable restraint upon commerce and is therefore per se unlawful and in violation of Section One of the Sherman Act, 15 U. S. C. § 1, and has caused damage to Plaintiff and other franchisees.

386.    Alternatively, even in the event that KWRI's conduct is not per se unlawful, it is unlawful by the rule of reason, in that the anti-competitive consequences of Defendants' conduct outweigh any positive competitive effects.

387.    Based on the foregoing, and due to KWRI's unlawful, anti-competitive conduct, Plaintiffs are entitled to damages in an amount to be determined at trial and treble damages, and to permanent injunctive relief prohibiting KWRI's unlawful tying conduct.

## AS AND FOR A THIRD CAUSE OF ACTION
### Embezzlement
### (Against Defendants KWRI, Gary Keller, John Keller, and KWx)

388.    Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

389.    Under Texas law, embezzlement is defined as "a fraudulent appropriation of the

property of another by a person to whom it has been intrusted." *Hartford Acc. & Indem. Co. v. Wichita Laundry Co.*, 23 S.W.2d 765, 768 (Tex. Civ. App. 1929).

390.   Texas law provides a civil remedy for embezzlement of funds. *Id.*

391.   Defendants KWRI and Gary Keller collected fees from franchisees which were specified for a particular use in the franchise.

392.   For example, Defendants KWRI and Gary Keller continuously collect a rising "technology fee" which, under the franchise agreement, is to be put towards improving KWRI technology.

393.   The franchise agreement outlines numerous other fees for defined uses.

394.   On information and belief, Defendants KWRI and Gary Keller have misappropriated and diverted funds collected from franchisees for purposes outside of the scope of the franchise agreement.

395.   On information and belief, Gary Keller has divested funds from KWRI and has transferred said funds to John Keller, his holding company KWx, as well as a number of other private entities, to the franchisees detriment.

396.   As a result, fees that are supposed to be put towards the improvement of the KWRI ecosystem for the good of the franchisees are instead put towards Gary Keller and John Keller's personal use, as well as towards funding additional entities which the franchisees are then charged for.

397.   All of these uses personally benefit the Keller Defendants, and harm the franchisees ability to operate by failing to provide the franchisees with adequate technology or support.

398.   Plaintiffs have been damaged by reason of the Defendants' conducting the affairs

of the KWRI franchise system through the pattern of embezzlement as described herein, which threatens to continue indefinitely into the future. As a result, Plaintiffs are entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**General Partner Liability**
**(Against Defendant Business MAPS Management, LLC)**

399.     Plaintiffs repeat and reallege each and every allegation above as though fully set forth herein.

400.     At all relevant times, Business MAPS Management, LLC has been the General Partner of Business MAPS, Ltd. Therefore, pursuant to section 153.152 of the Texas Business Organizations Code, Business MAPS Management, LLC is liable for the indebtedness and conduct of Business MAPS, Ltd., as complained of herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiffs John Davis and Jesse Herfel demand judgment against Defendants KWRI, Gary Keller, John Keller, Josh Team, MAPS, 72Sold, Jonathan Dupree, Marc King, Jason Abrams, Matt Green, William Soteroff, KWx, Livian, and the KW Southwest Region:

(i)      On the first cause of action for violation of Civil RICO pursuant to 18 U.S.C § 1962(c), a judgment awarding Plaintiffs damages in amounts to be proven at trial and trebled pursuant to 18 U.S.C. § 1964(c), plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)     On the second cause of action for violation of § 1 of the Sherman Act, a judgment awarding Plaintiffs damages in an amount to be determined at trial and treble damages, and to permanent injunctive relief prohibiting KWRI's unlawful tying conduct;

(iii)    On the third cause of action for embezzlement, a judgment awarding Plaintiffs damages in an amount to be determined at trial, plus prejudgment interest,

attorneys' fees, expenses, costs and disbursements;

(iv)    Such other and further relief as the Court deems just and proper.[19]

## JURY DEMAND

Plaintiffs herein demand a trial by jury of all triable issues in the present matter.

**Dated:**   New York, New York
November 20, 2023

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiffs*

**By: /s/ Andrew T. Miltenberg**
ANDREW T. MILTENBERG, Esq. (pro hac
vice application forthcoming)
amiltenberg@nmllplaw.com
KRISTEN MOHR, Esq. (pro hac vice
application forthcoming)
kmohr@nmllplaw.com
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Ph: (212) 736-4500
*Lead Counsel for Plaintiff John Davis*

JAMES CREWSE, Esq.
Texas Bar No. 24045722
jcrewse@crewselawfirm.com
CREWSE LAW FIRM, PLLC
5919 Vanderbilt Ave.
Dallas, TX 75206
Ph: (214) 394-2856
*Local Counsel for Plaintiffs*

---

[19] **Plaintiffs also respectfully request for this Court to refer this matter to the Department of Justice.**